# SCOTT WILSON & SON

## *vs.*

## LOUIS BLAUSTEIN, Trading as the American Oil Company.

### *Negligence—Filling Gasoline Tank—Various Possible Causes of Fire.*

Where the injury complained of by plaintiff may have resulted from one of several distinct causes, for only one of which defendant is liable, there can be no recovery unless it is shown that the injury was the result of negligence for which defendant is liable.                    p. 292

If a fire was caused by one or more causes, for all of which defendant was responsible, plaintiff may recover without showing which particular one was the cause of the injury.     p. 293

In an action for loss by fire occurring while plaintiffs' underground tanks were being filled with gasoline from defendant's tank truck, *held* that there was evidence that the fire was caused by a spark resulting from static electricity produced by defendant's negligence, it appearing that the driver of the truck connected two spigots of the truck with the funnel in the filling pipe by an old and worn piece of rubber tube, so that gasoline was spilt on the ground, the tube and the driver's arm, by reason of the movement and bursting of the tube, and the gasoline so spilt creating an inflammable and explosive atmosphere.
                    pp. 293-299

The brief or printed argument of the appellants, comprising one hundred and sixty pages, *held* to be so excessive in size as to justify an equal division of the costs in the Court of Appeals, although the judgment was reversed.                    p. 302

*Decided January 7th, 1924.*

Appeal from the Superior Court of Baltimore City (HEUISLER, J.).

Action by Scott Wilson and John S. Wilson, partners, trading as Scott Wilson & Son, against Louis Blaustein, trading as the American Oil Company. From a judgment for defendant, plaintiffs appeal. Reversed.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge, Adkins, and Offutt, JJ.

*Isaac Lobe Straus,* with whom were *Omar D. Crothers, William Pepper Constable* and *Joshua Clayton* on the brief, for the appellants.

*W. Calvin Chesnut* and *Charles Markell,* with whom were *Haman, Cook, Chesnut & Markell* on the brief, for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The appellants sued the appellee for damages alleged to have been sustained by them for loss by a fire claimed to have been caused by the negligence of the defendant, while delivering gasoline and "amoco" from an automobile tank truck into the plaintiffs' underground tanks in Rising Sun, Md. The plaintiffs had for some years been engaged in buying and selling gasoline, and also conducted a garage in Rising Sun. At the conclusion of the plaintiffs' case, a verdict in favor of the defendant was rendered by direction of the court, which granted three prayers—the first, that there was no evidence legally sufficient to entitle the plaintiffs to recover, the second, that there was no evidence legally sufficient to show that the fire in question was caused by any negligence on the part of the defendant, and the third, that there was no evidence legally sufficient to show that the fire in question was caused by any neglect of duty owing by the defendant to the plaintiffs—each of them concluding, "and therefore the verdict must be for the defendant." This appeal was taken from a judgment entered on the verdict so rendered.

The fire occurred June 13th, 1921. The plaintiffs had two underground tanks in the bed of a fifteen foot alley which ran northerly from Main Street in Rising Sun. The defendant, who was engaged in selling and delivering gasoline and other oils, was filling the underground tanks of the plaintiffs from a tank truck which had three compartments, one of which contained 250 gallons of "straight gas," the other two together about 750 gallons of "amoco." The intakes of the plaintiffs' tanks were about ten or twelve feet from the sidewalk on Main Street, and about four and one-half feet apart; about four feet and nine and one-half feet, respectively, from the plaintiffs' garage. The easterly underground tank had a capacity of 550 gallons and was used for "straight gas." The other, which was nearer to the garage, had a capacity of 1,050 gallons and was used for "amoco gas," a motor fuel consisting of a mixture of gasoline and motor benzol.

The plaintiffs had on the northwest corner of that alley and Main Street, a frame garage, and west of and adjoining that on Main Street, two large glass front stores, beyond which was their dwelling. On the easterly side of the alley there was a church. The garage, the dwelling house, the store and most of the stock of goods belonging to the plaintiffs are claimed to have been burned, as was the church on the easterly side of the alley.

The tank truck of the defendant came from Bel Air that morning, arriving about 9.45 o'clock at Rising Sun. It stopped in front of the garage on Main Street for a few minutes, and then went into the alley and drew up over the intake of the straight gas tank—the front of the truck being up the alley and the rear directly over the intake. The contents of the 250 gallon compartment of the truck were emptied into the easterly underground tank of plaintiffs by means of a funnel, about a foot high, inserted in the intake, and a part of an old inner tube about eighteen inches long, which was fastened to the spigot of the truck at the rear, and was hanging into the funnel. The engine of the truck was then

started, the truck went up the alley a short distance and then backed over the "amoco" underground tank, when the engine was again stopped. By means of the same funnel and two rubber tubes (made out of an old inner tube) there was a connection with the two spigots of the "amoco" compartments, and the contents of the "amoco" compartments were being emptied into the "amoco" tank of the plaintiffs, when suddenly a flash and a flame were seen in the rear of the truck, near the funnel. The truck itself took fire and later exploded, and the frame garage caught from that fire. The theory of the court, in taking the case away from the jury, apparently was that it was not shown with sufficient definiteness what caused the flame, but it seems to us that, although it may be conceded that it was not shown exactly what produced the flame, there was evidence of negligence on the part of defendant's servant, legally sufficient to go to the jury. Of course, where the injury complained of may have resulted from one of several distinct causes, and the defendant is only liable for one of them, but not for the others, there can be no recovery, unless it is shown that the injury sued for was the result of negligence for which the defendant was liable. The case of *County Com'rs* v. *Wise*, 75 Md. 38, cited by the appellee, only goes that far. So, in *Strasburger* v. *Vogel*, 103 Md. 85, where the plaintiff was injured by the fall of a brick from the top of the defendant's building, from which fact alone the doctrine of *res ipsa loquitur* would have been applicable, and an inference of negligence on the part of the defendant permissible, had it not appeared from the evidence that the brick which injured the plaintiff fell from a chimney during a parade, and that strangers, not under the control of the defendant, had leaned against the chimney. Chief Judge McSherry said: "When the plaintiff himself shows that the injury complained of must have resulted *either* from the negligence of the defendant, *or* from an independent cause, for the execution of which the defendant is in no way responsible, he cannot be permitted to recover until he ex-

cludes the independent cause as the efficient and proximate cause of the injury." Other cases were cited, but those sufficiently state the doctrine, and answer our present purpose. We do not understand that the authorities go to the extent of holding that if a fire was caused by one or more causes, *for all of which the defendant was responsible,* the plaintiff cannot recover unless he shows which particular one of them was the cause of the injury. That is wholly different from a case where the cause of the injury might be either the negligence of the defendant, or the negligence of a third party.

It may be, as contended by the appellee, that it was possible for gasoline vapor to drift quite a distance from the tank truck, out into Main Street, or into the garage, or into a kitchen or dwelling house, where it came in contact with an incandescent object, but that does not meet the question. The defendant inquired of Dr. Penniman, an expert, whether the gasoline vapor could not have been ignited by a lighted match, cigar, or cigarette, thrown out of a window on Main Street, or from a back fire from a Ford passing on that street, or from a horse passing on that street and striking a stone with his iron shoe, and other things of that kind, but there is no evidence of any such occurrence at or about the time of the fire. On the contrary, the evidence of those near the tank affirmatively tended to show that there was no such occurrence. The plaintiffs did offer legally sufficient evidence of actual negligence on the part of the defendant, some of which, or all of which together, could cause the flame. As was said in *Rosenburg* v. *Ambrose,* 129 Md. 418, 430: "If the appellant's theory must prevail, it will be impossible to establish liability on the part of a negligent defendant unless the plaintiff affirmatively excludes every possible way by which death may have resulted, or an injury could have been sustained."

There was evidence of the truck having been rapidly run that morning from Bel Air to Rising Sun, a distance of over twenty-four miles—a part of which was hilly and quite steep,

and it was a very hot day. The truck was a three and a half ton truck, and had in it about 1,000 gallons of gasoline and "amoco." When the driver stopped on Main Street in front of the plaintiffs' garage, he did not stop the engine at once, but did in a short time, and then ran the truck into the alley, and, backing it over the intake under one of the three spigots at the rear end of the truck, which was over the filling pipe of the underground tank on the church side of the alley, the driver took from the truck an old and worn piece of a rubber inner tube of an automobile tire, about eighteen inches long. He placed the tube over the outlet of the spigot and, having put a funnel in the filling pipe, placed the free end of the tube into the funnel. He then opened that spigot with the pressure of his hand upon it, having his hand there to hold the spigot open, and thereby let the gasoline run through the spigot into the funnel. The flow and pressure forced the end of the tube out of the funnel, and some gasoline was spilled on the hard surface of the alley beneath and near the heated part of the truck. The spilled gasoline extended several feet on the bed of the alley, and between the two underground tanks. The driver replaced the tube in the funnel and filled that tank—pouring about two hundred gallons of gasoline into it.

After he had filled that underground tank he started his engine, moved the truck forward about fifteen feet, and then backed it across the alley, so that the other two spigots were over the intakes of the underground tank nearer to the plaintiffs' garage. He then got another similar piece of an inner tube, placed the two tubes over the two of the spigots, inserted the funnel which he had used before in the intake, and placed the other ends of the two tubes in the funnel. As the two spigots were wider apart than the width of the funnel, one of the tubes converged toward the other. The driver opened both spigots and turned on the "amoco" and, instead of holding them open with his hand, fastened a measuring stick upon the spigots so they were held open. The flow of the

"amoco" caused the tubes to fly around the funnel and splash the fluid over its open surface. The driver took hold of one tube and asked William McNamee, a youth of seventeen years of age, who was standing there, to take hold of the other and prevent it from getting out of the funnel, which McNamee did. There developed in one of the tubes a hole and some "amoco" got out on the ground and upon the tube, as well as upon the arm of the driver. The hole got larger from the force of the flow, and during the time between the appearance of the hole in the tube and the first flash and outbreak of the fire the driver did not stop the flow of "amoco," using still the measuring stick to keep the spigots open. The mixture of air with the vapor from the gasoline and "amoco" formed an inflammable, combustible and explosive atmosphere, as the plaintiffs contend, which took fire. It would seem under the evidence that the methods of the defendant created a dangerous atmosphere which apparently formed the basis and substance of the fire. It ought not to require one to be an expert to know that such methods as the defendant adopted were not safe, and were likely to cause a fire which might do great damage, but the evidence of the experts did show the danger.

There is some difference of opinion between the witnesses as to the quantity of gasoline and "amoco" that was spilled on the ground and on and under the truck, but there was considerable, and there was also vapor coming from the funnel. Dr. Penniman testified that "a pint of gas makes two hundred pints of gasoline vapor," and he stated the same applies to "amoco"; or, as he said in answer to another question, a given quantity of gasoline vapor would make "about two hundred times its volume as a liquid." There was shown to be ample gasoline and "amoco" on the ground to make a vapor which, when it came in contact with the air and with some objects, as hereafter explained by quotations from Dr. Penniman's testimony, was liable to cause a fire. The Doctor said that "gasoline itself is not explosive and motor benzol is not by itself explosive, nor is a mixture of the two by

themselves explosive, but mixed with air, or, indeed, with anything that contains oxygen which is readily separated from its surroundings, if you will excuse the term, and brought to a temperature where action commences to take place between them, the mixture is explosive, if the relation between the oxygen and the carbon-hydrogen compounds is within certain limits, which vary, of course, somewhat in different cases."

He also said that gasoline and "amoco" will burn, but will not take fire instantaneously under ordinary atmospheric conditions. He was then asked to explain under what conditions, and the process under which gasoline or "amoco gas" would take fire, and replied: "Assuming in all the explanations which I shall now give you, that we are speaking by burning of a mixture of the vapor of gasoline and 'amoco' gas and air, they would be ignited by an electric spark, by a flame, or they will ignite—slow action will commence and may become accelerated if they are heated up to a temperature of about 500 degrees F. or a little higher, and quite rapid oxidizing action between the air and gasoline or 'amoco' fluid commences at about 500 degrees F. and continues from that point on progressively more rapidly if the temperature becomes higher by accelerated action between the air and the vapor from gasoline or 'amoco' fluid."

This also appears in his evidence: "Q. If the mixture of petroleum vapor and air were exposed to or came in contact with a heated object or surface, state whether or not that would start or begin such an increase in temperature or elevation of temperature that this oxidizing action you speak of might be begun? A. It would always begin. Q. In other words, the contact of mixture of air and gasoline, or "amoco" gas vapor with a heated object would start this oxidizing action between the two? A. Yes, sir; how fast or how far it would go would depend on the conditions. Q. By conditions you mean the extent of heat to which it was

originally subjected, or which was applied to it? A. And the new supply of new vapor."

Dr. Penniman also said when he was asked if he could tell how hot the exhaust was when it got to Rising Sun, "I cannot say how hot it was; I can only say how hot it might be." Again he said: "I could not say the actual temperature of the truck, and I do not want to state it, and I do not intend to state it, as a matter of fact."

There is also considerable expert testimony in the record from Edward A. W. Jahn, superintendent of Consolidated Gas Company of Baltimore; Carl Hauer, Jr., superintendent of the plant of the U. S. Industrial Chemical Company at Curtis Bay, and others. There was certainly enough evidence on that subject to go to the jury. In *Spanish Amer. Cork Co. v State, use of Schneider,* 134 Md. 605, no one knew just what caused the death of William Schneider, as it was not shown and could not be definitely shown whether it was from a candle or test lamp (both of which he had), or what, in contact with cork dust in the cellar, but Judge Pattison said there was sufficient to go to the jury reflecting upon the question as to how Schneider met his death—"especially in view of the fact that there is no other plausible theory suggested by which such injuries could have been sustained." In *Consol. Gas Co. v. Getty,* 96 Md. 683, CHIEF JUDGE McSHERRY quoted from *Balto. & P. R. R. Co. v. Reaney,* 42 Md. 136, that "Courts do not indulge in refinements and subtleties as to causation that would defeat the claims of natural justice. * * * But it is equally true that no wrongdoer ought to be allowed to apportion or qualify his own wrong; and that, as a loss has actually happened whilst his own wrongful act was in force and operation, he ought not to be permitted to set up as a defense that there was a more immediate cause of the loss, if that cause was put into operation by his own wrongful act." Then Chief Judge McSherry went on to say in that case, where it was shown that

the explosion occurred in consequence of a policeman having brought a lighted candle in contact with escaping gas: "That the escape of the gas was the efficient cause of the explosion cannot reasonably be disputed. If there had been no escape of gas there could have been no explosion. The escape of gas if negligent was a wrongful act, and it occasioned the use of the candle—it was the wrongful act which put into operation the other cause and was consequently the efficient and predominant cause of the injury."

But without further discussing that branch of the case, there was undoubtedly sufficient evidence to go to the jury on the question of the flame being caused by a spark, the result of static electricity produced by the negligence of the defendant. Young McNamee testified that when he was holding the rubber tube he noticed the hair on his arm begin to rise and point to the tube, and then the hair became quite erect. It was so marked that he turned to tell his companion about it. After the gasoline "was running about three minutes I noticed the hair on my arm stood up straight and I heard a noise and saw a blaze"; that he did not think he had finished telling his companion about it "until the flame started"; that he heard a noise like a gas stove before the flame started, or at the same time he saw the flame; that he saw the flame all around and he ran.

Dr. Penniman testified as to that: "The raising of the hair under those conditions would be the discharge of the rubber hose to the hairs on the boy's arm." Again he was asked—"What would be the effect of the stored static electricity in a case like this?" and replied: "A spark could well jump from the rubber to the boy's arm." He was then asked—"If the spark did come from this boy's arm what would have been the result; where would the ignition have been?" and answered:

"Ignition would have been at the point where the spark occurred, but the ignition might have been a comparatively

rapid or a comparatively slow one, and it would not necessarly mean there was an immediate process of flame; it might be slow combustion and run some distance to a richer or a poorer part of the surrounding elements or combustible substances." Again he was asked: "From the descriptions before given you of the extent of the gasoline which had been flowing from the rear of this tank truck into the funnel and which had been spilled over the ground and around the rear of the tank truck and both underground tanks, would you say that a sufficient vapor would have emanated from such gasoline fluid and 'amoco' gas fluid which, mixed with air, might have been set on fire by these sparks?" to which he replied "Yes."

Another important piece of testimony given by Dr. Penniman was: "If a fire had been started by gasoline and air and vapor around the rear of the automobile truck where the spigots were located and the spigots were running and remained open so that the gasoline flowed from two spigots, the bore being an inch and a half, and continued to flow, would that flow of gasoline and vapor rising from it, add to the fire which might be present in a limited amount?" and he replied: "Yes, sir." That was certainly negligence.

In addition to the exception which presents the ruling on the prayers, there are forty-nine others, presenting rulings on the admissibility of evidence. Many of them do not seem to be material, as the questions were in effect answered elsewhere in the record, and the strong probability is that some of them would have been so answered by the witnesses as to make them useless, as we cannot believe that they would have attempted to answer some of them. If we undertook to discuss them separately, it would lengthen this opinion beyond all reason, and hence we will, for the most part, only state our conclusions as to them, without discussing them. We do not find any error in the first, second, third, fourth, fifth, sixth, seventh and eighth exceptions, as, excepting in so far as Dr. Penniman did answer the questions elsewhere in the record,

it would seem to be difficult, if not impossible, for him to do so, judging from what he said. For example, he said in the sixth exception, "I could not say the actual temperature of the truck, and I do not want to state it, and do not intend to state it as a matter of fact," and other expressions that he used might be quoted. There must be some mistake in the question in the ninth exception, as it is incomplete. We do not understand just what question the appellants insisted upon the witness answering in the tenth, as that is not clear in the record. We think there was no error in allowing the question on cross-examination in the eleventh exception. The twelfth, thirteenth, fourteenth, fifteenth, sixteenth and nineteenth were intended to present questions which might have been of service to the jury, but the form of some of them could be much improved, and the evidence allowed was probably as far as the witness would go, without simply guessing. There was no error in the seventeenth, eighteenth or twentieth. The twenty-first to the twenty-fifth exceptions inclusive present questions which are objectionable in several respects. The questions in the twenty-sixth, twenty-seventh and twenty-eighth seem to us to have been relevant, if the witness could answer them, and had not already done so. The regulations referred to in the twenty-ninth do not seem to have been in force in this State before the fire. The question in the thirtieth exception should have been more definite as to the size of the rubber hose, the conditions, etc. The same can be said of the one in the thirty-first. The thirty-second and thirty-third do not seem to be objectionable, if the witness sufficiently understood the facts referred to, but other testimony in the record would seem to make them of little value. There was no error in the thirty-fourth, thirty-fifth, thirty-sixth or thirty-seventh. If the thirty-eighth includes all the sufficient facts it would be of use. What we have said of questions asked Mr. Haner are on the assumption that the lower court had concluded he was competent as an expert and that he did not mean to limit his answers to experiences in his

own company. We do not see how the appellant was injured by the rulings on the thirty-ninth and fortieth, as the witness had practically answered the questions in his former evidence. We find no error in the forty-first, forty-second, forty-third, forty-fourth, or forty-fifth. The question which was ruled out in the forty-sixth was answered afterwards. There was no error in the rulings on the forty-seventh, forty-eighth or forty-ninth.

As we will reverse the judgment by reason of the error in granting the three prayers offered by the defendant, and we would not be inclined to reverse it for any error discovered in the rulings on the exceptions to evidence, we have simply suggested our views of them, so that in case of a new trial some of them, as indicated by us, can be put in better form.

If the witnesses offered as experts are qualified to answer, it would be helpful to a jury, and indeed to the court, to have them explain whether static electricity would accumulate on such tubes as used in this case, the effect of heat on the truck under all the conditions, etc., but the effect of most of the testimony ruled out substantially came in without objection at other parts of the record.

It was not urged, but we considered the question of whether there had been contributory negligence on the part of the plaintiffs, but do not think there was such marked negligence on their part, or that of either of them, as to justify the question being taken from the jury.

We feel constrained to refer to the size of the record and the brief of the appellants in this case. We have been insisting that the records be reduced, and in *Oxweld Acetylene Co.* v. *Hughes,* 126 Md. 437, 444, JUDGE URNER referred to several cases on the subject, and this Court required the appellant to pay half of the cost of the record, although the judgment was reversed without a new trial. It could have been very materially reduced in this case without injury to the parties. We hesitate to refer to it, as it was helpful to the Court to have full reference to evidence in a record of this

size and liberal citation of authorities was very useful, but while our rules in that respect might probably be more specific, Rule 39 and Rule 40 make a distinction between briefs and printed arguments, which is frequently not observed as it should be. Rule 40 authorizes written or printed arguments, but provides that "the cost of such arguments shall not be taxed as part of the cost of the cause excepting as provided for in Rule 38," which is not applicable here. Rule 39 states what briefs must contain—"an abstract of the case and a full and explicit statement of the several points relied on, with the authorities sustaining them, accurately cited and distributed under their proper heads." These rules have been so often ignored recently that we feel called upon to take some action in reference to them. The appellants' brief, as it is called, has one hundred and sixty pages in it, and is more of a printed argument (a very good one too, we must admit) than a brief. The appellee has fifty-three pages in his brief, which is also a good one, but would seem to be at least very near the limit which ought to be taxable in the costs of the case. So, although we will reverse the judgment, we will divide the costs in this Court equally between the appellants and the appellee. See *Jordan* v. *Piano Company,* 140 Md. 207.

> *Judgment reversed and new trial awarded, each side to pay one-half of the costs in this Court, the costs below to abide the final result of the case.*