Joan Knight Gosnell entered suit in the Baltimore City Court against the Baltimore Ohio Railroad Company for injuries sustained in a grade crossing accident on February 25, 1946. The defendant, appellee, filed a demurrer prayer but the trial judge allowed the case to go to the jury. The jury was unable to agree. The trial judge later entered a judgment non obstante veredicto
for the defendant for costs. From that judgment the appellant appeals.
On the demurrer prayer the evidence presented must be set out in some detail in a manner most favorable to the appellant.
On February 25th, 1946, at about 6:40 p.m. the appellant, Joan Knight Gosnell, the weather being clear, the street dry, and it being dark at the time, was riding in an automobile traveling in a southerly direction, driven by her husband, Walter Gosnell, on Potee Street in the area known as Brooklyn in Baltimore City. Potee Street is a dual boulevard with four lanes for traffic and is connected on the north end with Hanover Street and at its south end with the Ritchie Highway. It is generally used as a cut-off to avoid traffic through the business district of Brooklyn. This was the first time that the appellant and her husband had ever driven on this street and they did not know that there was a railroad grade crossing anywhere in the vicinity. A single track of the appellee crosses Potee Street approximately 1,000 feet south of Hanover Street at almost a right angle. It was stipulated and agreed that the base of the railroad crossing sign is 20 feet north of the north rail and the crossing sign on the south side is the same distance. The watch box located east of Potee Street and south of the railroad is 10 feet south of the south rail. Potee Street is a boulevard. No flashing lights, bells, or safety gates were maintained by the appellee, at this crossing. The plaintiff offered to prove "that at Hanover Street, one block to the east of Potee Street, the same railroad tracks cross and that at the Hanover Street crossing, the Baltimore *Page 680 
and Ohio Railroad at the time of the accident and for a long time prior thereto, had installed and was maintaining in operation safety gates." This proffer was refused by the trial judge. Potee Street has an over-all width of 54 feet. The opposing lanes of traffic are separated by a concrete plot six feet in width and about six inches high, which therefore affords a south lane for traffic 24 feet wide and a north lane for traffic of the same width.
The appellant testified that her husband was driving the car rather slowly at a rate of approximately 15 or 20 miles an hour, in a southerly direction in the south lane and on the right hand side of that lane. They were riding home from work and she had never been on that road before. The usual route was over another road. She did not know there was a grade crossing over Potee Street or anywhere ahead of her. Her husband had full command of the car at that time. She saw no flashing lights, safety gates, or sign ahead of her. She did not see any one or any warning device. They were proceeding in the slow driving traffic lane on the right. She had been looking straight ahead and suddenly turned to the right and saw almost on top of her a "big black engine" without a headlight. She cried out to her husband: "Oh, my God, oh, Walter, look." Her eyes were still on the train. She felt her husband turning the automobile in the same direction that the train was running but they were trapped and did not have a chance. She heard no whistle blown or bells rung. Both windows in the automobile were lowered. The engine was about 50 feet from her and practically right on top of her when she first saw it. She was not expecting the train. She was more or less on the alert because she had driven an automobile prior to the accident and is always on the alert when she rides in a car driven by someone else. The train crashed into the right side of the automobile where she was sitting, and she felt excruciating pain and was knocked unconscious. *Page 681 
Her husband, Walter Gosnell, testified that he is a rural mail carrier, and that he had never been over Potee Street before. He turned to the right from Hanover Street into Potee Street at the traffic light. He shifted into high gear and was going about 15 miles per hour. The time was about 6:40 p.m. The weather was clear, the road dry, and it was dark. He did not know there was a grade crossing on Potee Street. This was the first time he had been over that street. As far as he can recall, his headlights were on low beam. He noticed some traffic coming towards him in the north lane. He was on the extreme right of the southbound lane near the curb. He did not see any traffic going in the same direction that he was traveling and he does not remember seeing any cars in front of him. He does not think any cars passed him after he made the turn into Potee Street. The lights on his car shed a rather broad beam. He saw no flashing red lights, safety gates, warning lights of any kind, no watchman, nor any danger signals. He heard no whistle blown nor bells rung. The first notice he had of the locomotive was when his wife called to him. He saw no lights on the locomotive. He looked around and then "the black thing" was about 10 feet from him. He cut his wheels to the left and the locomotive struck the automobile about at the right front wheel. Before the accident he was looking straight ahead. After the accident the car was facing east, the same direction the train was going. He was knocked unconscious. He said he did not tell the conductor that he had seen the crossing watchman waving a red light, but could not stop.
On behalf of the defendant, Eugene A. Wright, the fireman on the locomotive, testified that he was riding on the left side of the engine as it approached the crossing. The engine was equipped with an automatic bell. The bell was turned on about the time the signal whistle started as they approached the crossing and continued ringing until the locomotive stopped and it was turned off. The engine was moving with about 50 cars of coal *Page 682 
at the rate of 10 or 15 miles an hour. As the locomotive approached Potee Street a car ahead went over the crossing just in front of the locomotive. The Gosnell car then was an estimated distance of 150 to 200 feet from the crossing when the locomotive was about 75 feet from Potee Street. The appellant's car, however, did not stop. At the time of the accident the emergency brake was thrown on and the locomotive stopped in the distance of two or three car lengths. The head light was burning at the time of the accident. Before the accident he saw the watchman come out of the box on the right hand side of the tracks and on the opposite side from him. He did not see the watchman on the north side of the tracks.
Charles M. Miller, the engineer on the locomotive, stated that he lighted the head light on the engine before leaving Cliffords, which is about one and one fourth miles from the scene of the accident. The engine was a large mountain-type steam locomotive, over 89 feet in length, with a height of about 13 feet and weighed with the tender 160 tons. After leaving Cliffords he blew the crossing signal, two long, one short and one long blast. After passing the Patapsco River Bridge, approaching Potee Street, he blew the crossing signal again. He then blew a signal for the operator at Hanover Street, four short blasts of the whistle and after receiving the signal from him to go ahead, he answered with two short blasts of the whistle. As he approached Potee Street he noticed the crossing watchman waving his red lamp to stop traffic, which on the northbound lane had stopped probably 100 feet or more before he reached the crossing. He said that the watchman was waving the lantern about in the middle of Potee Street on the same side he was on. He did not know anything of the accident until the fireman called him. He saw the watchman start to run back from the crossing about the time the fireman called to him that he had struck an automobile. *Page 683 
John H. Wilson, the telegraph operator for the defendant stationed at Hanover Street, testified that he received a call from the conductor of the train at Cliffords, and he told him to come on. He saw the head lights on the train as it was leaving Cliffords Woods. The engineer blew the regular signal for Potee Street, two long blasts, one short and one long, and when the engineer gave the four longs for Hanover Street he let the crossing gates down and gave the engineer the green signal.
Raymond J. Crabill, the conductor of the freight train, testified that they arrived at Cliffords about 6:10 p.m.,
called the operator at Hanover Street on the telephone and left soon after that. He was riding on the engine. The headlight was burning, the automatic bell was ringing and the whistle blown at different intervals from Cliffords and as they passed Potee Street. He did not see the accident. The first he knew of it was when the fireman called. He said after the accident, Mr. Gosnell told him that he saw the watchman waving a lantern but could not stop.
Joseph W. Harris, the brakeman on the train, said he did not see the accident, but the whistle was blowing, the headlight was burning, and the bell was ringing as they approached Potee Street.
Alliston Carroll, a witness produced by the defendant, at the time of the accident, was a chauffeur on a tank truck. He said he was coming from Curtis Bay going north on Potee Street. As he approached the railroad crossing he saw a crossing watchman there standing on the concrete base in the middle of Potee Street flagging traffic with a lighted lantern. He flagged northbound traffic first and then he started flagging southbound traffic. The watchman swung his lantern for southbound traffic to stop. He stopped his truck in response to the flagging on the inside lane "coming north, right next to the curb." He saw a taxicab go across the track. Another car followed it. He then saw the car which Mr. Gosnell was driving approaching and he thought the *Page 684 
train was going to hit it. The watchman was flagging southbound traffic before the taxicab went across. The watchman did not leave the place where he was flagging southbound traffic until Mr. Gosnell was within 50 feet of him and between 35 and 40 feet from the crossing. Mr. Gosnell's car was the third car to go across. The headlight was burning on the locomotive and he first saw the headlight about 600 or 700 feet up the road. He heard the whistle of the locomotive blown as it approached the crossing. When the train hit the car he heard the brakes applied and the train stopped seven or eight car lengths ahead. The engine was then across Hanover Street.
Fred Carter testified for the defendant that he had been the watchman on the crossing only a day or so before the accident happened. He was the substitute for the regular crossing watchman. He said he was equipped with two red lanterns and one white one. The lanterns were lighted and were bright. He saw the train approaching from the direction of Cliffords. He was sitting in the watchbox, the headlights of the engine were on. When he saw it coming he walked outside. Before he got his lanterns he waited until it got a little closer. He said, "Well, I was sitting in my watchbox, I saw the train coming, the headlight, and when I saw it coming, I walked outside. Before I got my lanterns, I waited until it got a little bit closer. When it got the average of the time you are supposed to start to give it a safety signal, I go back, picks up my two red lanterns, and white lantern, I stop my northbound traffic and hang a red lantern aside the road there and so I walks to the center and start waving the southbound lane, it's right in the middle concrete there, it's raised concrete, so after I start waving my lanterns, there was a taxi driver and another car went across and as the train, both, and the accident car was coming up, I saw them about the same distance and I knew they were going to hit so I turned and run beside the oil tanker that I had already stopped, Amoco oil tanker, and after I heard it hit I *Page 685 
turned back and run back there to the coal cars, jumped up between the coal cars, saw a woman laying out there on the hard surface." He first saw the Gosnell car when it was about 50 feet from him and while he was in the center of Potee Street. He said the reason that he left that place was: "I left for my own protection, I didn't want to get hit, I didn't know if any part of the cars would fly over there and hit me or not, and of course, I turned my back on it. I have seen accidents before, and I didn't like to see no accident then." He said the first thing he did when he came out of the watchman's box was to get the two lanterns. He did not wave the lanterns immediately but judged the distance of the train and the volume of traffic. The traffic was "going pretty fast on Potee Street. There was quite a bit of traffic," and he let some go by. The train was coming closer all the time. He flagged down the oil tanker in the northbound lane of traffic, south of the railroad track, hung up one red lantern on the post beside the watchman's shack apparently to signal northbound traffic, walked over to the center of the dual highway and started flagging down the southbound lane. He did not cross the railroad tracks but stayed on the south side the whole time. The taxicab at that time was going pretty fast. He did not know whether the taxicab was in the left hand lane of traffic or the right hand lane. When he first saw the Gosnell car it was about 50 feet from the crossing and the train was about the same distance from the crossing. The Gosnell car when he first saw it was in the right hand lane of traffic and it was going "pretty slow, it wasn't going fast." He ran to Hanover Street and told the operator to call an ambulance. When he got back to the scene of the accident he testified: "There was a guy said I didn't have no lights, no signals." He doesn't know who that was. He said: "Well, I cussed him out and told him I did; he got me hot."
It is conceded by the appellee that there was no contributory negligence on the part of the plaintiff, appellant, in this case. The question before us, therefore, is *Page 686 
whether there was legally sufficient evidence of primary negligence on the part of the appellee to submit this case to the jury.
For the appellant we have the direct testimony of the appellant that she heard no whistle blown or bells rung although both windows in the automobile were lowered. She said she saw no flashing lights, safety gates, or sign ahead of her and when the engine was about 50 feet from her and practically on top of her she suddenly turned to her right and saw the "big black engine" without a headlight, and at that time she called to her husband. He testified that the first notice he had of the locomotive was when his wife called to him. He looked around and he saw no lights on the locomotive and "the black thing" was about 10 feet from him. For the appellee, there is definite testimony by Wright, the fireman, Miller, the engineer, Wilson, the telegraph operator, Crabill, the conductor, and Harris, the brakeman, that there was a headlight on the locomotive, the bell was ringing, and the signal whistle blown for the crossing. Alliston Carroll, a disinterested witness and the driver of the tank truck, said that the headlight was burning on the locomotive and the whistle blown as the locomotive approached the crossing. He did not testify as to whether the bell was ringing. Fred Carter, the watchman, said that the headlight was lighted on the locomotive but did not testify whether the automatic bell on the engine was ringing or whether the signal whistle was blown.
There was, therefore, positive testimony from those on the engine, the watchman, the telegraph operator, and the disinterested witness that the headlight was burning on the locomotive and the whistle was blown. The appellant and her husband saw the locomotive more-or-less momentarily and in a moment of great excitement. The locomotive was coming from their right almost at right angles. In the light of the overwhelming testimony that the headlight was lighted and the whistle was blowing, we do not think the testimony of the appellant and her husband of their non-observance of *Page 687 
these facts, under the circumstances related, justified the submission to the jury of the question of negligence on the part of those operating the train. If the accustomed warning was given and it was adequate the fact that it was not noticed by the appellant and her husband does not make the train crew negligent. The facts here are distinguishable from those in the case ofKrause v. Baltimore O.R. Co., 183 Md. 664, 39 A.2d 795. In that case there was a dispute as to whether it was light enough, in a foggy dawn, for a headlight to be necessary, and positive testimony by a disinterested witness that he saw the light turned on after the accident. The locomotive was of a noiseless, Diesel type, not attached to a loaded train, and there was positive testimony that no signals were given at a crossing otherwise wholly unprotected.
Code, Pub. Loc. Laws 1930, Article 4, § 791, provides: "All railroad companies whose tracks cross any street in Baltimore City at grade, are required to place, erect and keep in operation and repair, safety gates at all such street crossings in said city, which said gates shall be closed on the approach of any and every train of cars or locomotive, and kept closed until the said cars or locomotive have completely passed said street crossing." The trial judge excluded all reference to the statute and refused to instruct the jury about it, because he held it was obsolete. It is admitted in this case that there were no gates at this crossing as required by the aforesaid statute. It is the settled rule in Maryland that the mere violation of the statute or ordinance does not support an action for damages. However, it is also well settled that where such a violation is the proximate cause of an injury a right of action does accrue to the party injured. Hopper McGaw Co. v. Kelly, 145 Md. 161, 169,125 A. 779; Kelly v. Huber Baking Co., 145 Md. 321, 334, 125 A. 782;Cumberland Westernport Transit Co. v. Metz, 158 Md. 424, 438,149 A. 4, 565; Brown v. Bendix, 187 Md. 613, 51 A.2d 292. *Page 688 
The appellee contends that the aforesaid statute is obsolete under the authority of a statement made by this Court in the case of Krause v. Baltimore Ohio R. Co., 183 Md. 664, 668,39 A.2d 795, 797, where it was said: "The absence of crossing gatesunder the circumstances in this case is not evidence of negligence, to which could be attributed this accident. We thinkthe city law requiring crossing gates at this point is obsoleteand that in any event appellant being fully familiar with thecrossing did not require for his protection reliance uponcrossing gates or watchmen." (Italics supplied here.) TheKrause case held that the absence of gates was not the proximate cause of the accident in that case. It should not be construed to mean that the statute was not applicable at other locations and under different circumstances.
In the case of Negretti v. Baltimore Ohio R. Co.,179 Md. 30, 16 A.2d 902, this Court considered the failure of the Baltimore Ohio R. Co. to have safety gates required by law. In that case the plaintiff ran against a car on a railroad crossing of which he knew, and although the gates were not present, this Court pointed out that the train itself was a sufficient warning of the danger. The statute requiring safety gates was not said to be obsolete in that case. In the case of Buczkowski v. Canton R.Co., 181 Md. 377, 30 A.2d 257, a collision occurred between an automobile and a box car standing on the railroad crossing. The Court in that case considered the failure of the railroad to have the safety gates at the highway crossing, Article 4, § 791,supra, but held that the absence of the safety gates was not the proximate cause of the collision. The car itself on the crossing was as much warning to the approaching motorist as the safety gates would have been. This court said in that case at page 380 of 181 Md., at page 259 of 30 A.2d: "The failure to have safety gates at this crossing does not seem to have been the proximate cause of the accident. The cause was the failure to see the box car, which was much larger, and had a much higher *Page 689 
visibility than safety gates would have had. The latter are chiefly valuable in warning drivers on the highway of an approaching train, and not in giving notice of a train already on or crossing the highway, which of itself gives better warning than the gates. Doland v. Bremner, 220 Iowa 1143, 263 N.W. 798;Olson v. Chicago, etc., R. Co., 193 Minn. 533, 259 N.W. 70."
The jury here should have been permitted to have considered the statute, Article 4, § 791, supra, in order to determine whether its violation was the proximate cause of the accident.
In view of the fact that there were no safety gates, we must determine whether there was not sufficient evidence that the lack of warning to the appellant was the proximate cause of the accident to justify submission of the case to the jury.
It is only where the minds of reasonable men cannot differ that the Court is justified in deciding this question as a matter of law.
The case of Pennsylvania R. Co. v. State, 188 Md. 646,53 A.2d 562, 565, involved a grade crossing collision between a train and a truck. At that crossing the railroad was guarded by automatic blinkers which flashed red warning lights whenever trains approached the crossing. It was also shown that it was the custom and practice of the railroad company to provide a flagman during switching operations which were conducted at the point where this accident happened, and which were being conducted at the time of the collision. No flagman was there at the time of the accident in that case. This Court there pointed out:
"`* * * Thus, a railway company may station a watchman or install safety gates or automatic signals at a crossing over which the traffic is not so heavy as to require such precautions. Having led the travelling public to regard the failure of the watchman to wave his flag as an assurance that the track is clear, the company cannot discontinue the watchman without reasonable notice. So too, it must keep safety gates or signals in *Page 690 
working order until they are removed or reasonable notice of their abandonment is given.' * * *
"Knowledge or lack of knowledge of a custom to warn, or of the fact that customary protective signals have been abandoned or are not in operating condition, has an important bearing upon the question of the exercise of care by the plaintiff, but it does not affect the question of primary negligence. * * *
"But once the duty of care to a certain class of persons is established, there would appear to be no room for a contention that the primary obligation extends to some and not to others. Of course, in the instant case, contributory negligence of the truck driver, if any, could not be imputed to the passenger. * * *"
In the case at bar it is admitted that there was no contributory negligence on the part of the appellant. The watchman said the automobile was going slowly. With no safety gates, no bells or lights at the crossing, it appears that the railroad crossing sign was not adequate to warn travelers at night. The railroad company undertook to warn those persons on the dual boulevard of the grade crossing by a watchman. In the absence of all other warning devices, the appellant and her husband testified absolutely that they were looking straight down this road and saw no watchman and received no warning. The substitute watchman himself testified that he saw the train approaching from Cliffords which is not more than one and one-quarter miles from his watchbox. He was sitting in the watchbox at the time. He did not proceed immediately to get his lanterns, although he admits that there was "quite a bit of traffic" and it was "going pretty fast on Potee Street." He waited until the train got a little closer. He then picked up three lanterns, walked out on the road, signaled the northbound traffic. He then hung a lantern on the north side of the road and walked, without crossing the tracks, to the center of the highway 54 feet wide where he attempted to warn southbound traffic. He himself admits that he did not see the car in which the appellant was riding *Page 691 
until it was within 50 feet of the railroad crossing. It appears that as this car was coming up a straight stretch of road the watchman should have seen the lights of the Gosnell's automobile as soon as he started facing southbound traffic. If he was in a position where the other cars blocked his view of the Gosnell car, he did not so state. He was where he placed himself. Therefore, he must not have faced the southbound traffic and given his warning until the Gosnell car was within 50 feet of the crossing. The watchman himself admits that he was accused by some one at the crossing, other than the appellant and her husband of having no lights and no signals, which he denied. This evidence was before the jury for whatever weight they might give it. Also two cars passed the watchman, going south, after he says he gave the warning signal which is to be considered in determining whether the warning signal was adequate. The appellee not having safety gates, in the absence of all other safety devices for crossing warnings at night, reasonable minds might differ as to whether the watchman gave the warning in sufficient time and in such a manner as to adequately warn the driver of appellant's car of the danger. The minds of the jury in this case, without any information as to the requirement of safety gates, did differ as to the primary negligence of the railroad company. The actions of the watchman were the actions of the appellee. The case should be submitted to the jury on the question of primary negligence on the part of the appellee.
Judgment reversed with costs, and new trial awarded. *Page 692