# GARDENVILLAGE REALTY CORPORATION
ET AL. *v.* TONY RUSSO ET AL.

[No. 132, September Term, 1976.]

*Decided December 2, 1976.*

The cause was argued before GILBERT, C. J., and THOMPSON and MOORE, JJ.

*Emanuel H. Horn* for appellants.

*John T. Enoch*, with whom was *Leonard J. Grossman* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

After a jury trial in the Superior Court of Baltimore City, the appellees Gertrude Russo and Tony Russo, her husband, obtained judgments totaling $98,716.44, and the appellee Gertrude Sajdak, individually and as personal representative of the estate of her husband, George Sajdak, obtained judgments totaling $26,978.30 against the appellants, Gardenvillage Realty Corporation (Garden) and the Arkwell Company, n/k/a The Thunderwood Company (Thunderwood). The judgments were also entered against Alex Luciano and Alex Luciano Company, Inc. by the direction of the trial judge, but no appeal has been filed by the Lucianos. Garden filed a cross-claim against Alex Luciano and Alex Luciano Company, Inc. which was

submitted to the judge without intervention of the jury and he gave a judgment in favor of the cross-defendants. Garden also appeals from the denial of its cross-claim. Regional Management Incorporated was originally a defendant but received a directed verdict in its favor. There is no appeal from the judgment entered on that verdict.

On September 25, 1971, Gertrude Sajdak was standing on a concrete slab which constituted the base of the rear porch of the dwelling located at 5911 Laclede Road, Baltimore, and her daughter, Gertrude Russo, was standing beneath the porch attempting to unlock the cellar door, when the porch collapsed causing severe injuries to both of them. Mrs. Russo and her husband at the time of the accident were tenants in the property and Gertrude Sajdak, her mother, was an invitee. The legal title to 5911 Laclede Road, Baltimore was held by Garden. Thunderwood held the "beneficial title." The record shows that Regional Management Incorporated managed the property in question as well as some 7,000 houses in the City of Baltimore; Regional and the appellants were all part of the Macht group of companies which were engaged in large scale building, renting, and selling of homes. Thunderwood acted as general contractor and applied for the building permits.

Alex Luciano, individually, or as Alex Luciano Co., Inc., under a written order from Thunderwood dated July 22, 1960, undertook to manufacture and install, in accordance with the provisions of the Building Code of Baltimore City, precast concrete slab rear porches at all 600 homes in the Garden project, including 5911 Laclede Road. In 1964, Luciano, after initially measuring the size of the slabs required for these homes, manufactured and installed the slab for 5911 Laclede Road, using his own men and equipment, free of any direction, supervision or control from the appellants as builder and owner.

The precast concrete slabs manufactured by Luciano, measured 3-1/2 feet by 5-1/2 feet by 4 inches for the porch in question. The slab was made by pouring concrete into a mold, then adding steel reinforcing rods. The rods were then covered with more concrete to complete the slab. When the

slab was completed, the rods were completely hidden from view. This type of precast slab was described by the appellees' witness, Samuel Mortimer, Chief of Engineering of the City of Baltimore, as an "elementary type structure" which required no detailed plans or specifications. Donald Radcliff, an architect since 1954, testified that it was not a general practice in the trade to draw plans or submit specifications with regard to precast concrete porches.

The cause of the collapse of this slab, some six years following its construction and installation, was that the metal reinforcing rods within the concrete slab ran the wrong way. Proper construction required that the rods be placed lengthwise in order to properly support the weight of the slab. In the case of the slab furnished for 5911 Laclede Road, the rods were not so placed, and Luciano admitted that the precast concrete slab rear porch at 5911 Laclede Road failed through his negligence.

According to Samuel Mortimer, the failure of Luciano to insert the metal reinforcing rods in the proper direction would constitute a violation of the Building Code. The inspection by the City authorities of 5911 Laclede Road, after its completion, did not reveal this defect.

Luciano had manufactured precast concrete products in conjunction with his father and brother for a period of some 30 years prior to 1960 and had furnished companion companies of the appellants with various types of precast concrete products, including precast concrete front porches, precast steps and other precast concrete forms which required the use of metal reinforcing rods.

The building permit for 5911 Laclede Road was issued on October 25, 1963. The appellants, Garden and Thunderwood, listed as owner and general contractor, respectively, became permit holders and, as such, were required to conform to and comply with the Baltimore City Code. Mr. William H. Cohen, Vice President of Thunderwood, was responsible for purchasing and, in that capacity, was familiar with the Baltimore City Code and with building permits. Mr. Cohen would consider a supplier incompetent if the supplier did not have knowledge of the Code. Mr. Samuel Mortimer, whose

job it is to enforce the Building Code, testified that it would be a prerequisite for any individual or corporation building prefabricated porches to be familiar with the Building Code. He, like Mr. Cohen, expressed an opinion that an individual or corporation building these porches, having no knowledge of the Code, would be incompetent.

Luciano does not now and never did have knowledge of the Baltimore City Code requirements for making concrete slabs. In making the precast concrete slab for 5911 Laclede Road, he did not refer to the Baltimore City Code. Mr. Cohen gave Luciano no details other than the size, price, and directions to comply with the Baltimore City Code. He did not ask if Luciano knew about the Code, nor did he ask if he knew anything about engineering manuals pertaining to the building of porches. The order directed Luciano to adhere to the Code and Cohen did not check to see if, in fact, he did. Mr. Donald Radcliff, the architect who drew up the plans used by the appellants to get the building permit, included in the plans a reference to the concrete back porch, giving the size of 3-1/2 ft. x 5-1/2 ft., but gave no further details concerning the prefab ' porch. Had he been asked, Mr. Radcliff would have supplied the details. In order to do so, he would have had to refer to the Baltimore City Code or an engineering manual concerning requirements of reinforcements. Mr. Radcliff would not consider a supplier qualified who had no knowledge of the Code.

### Appellants' Motion for Directed Verdict

The appellants argue that their motion for directed verdict should have been granted because an owner-builder is not liable, as a matter of law, for injuries resulting from a latent defect. In making their argument the appellees concede that the slab in question was negligently manufactured by Luciano, an independent contractor, by improperly inserting the reinforcing bars in the wrong direction. They also concede that the negligence was the cause of the collapse six years after manufacture and installation by Luciano. For the purposes of the argument they concede that there was a violation of the Building Code.

It is well settled in Maryland that a violation of a building code can be evidence of breach of a duty owed. *Stein v. Overlook Joint Venture*, 246 Md. 75, 227 A. 2d 226 (1967); *Sezzin v. Stark*, 187 Md. 241, 49 A. 2d 742 (1946). The pertinent parts of the Building Code of Baltimore City, rev. 1962 Ed., are the following:

"1010. *General purpose* of this Code is to establish standards and to make provisions and requirements regulating the design, construction, reconstruction, installation, alteration, repair, razing, demolition, moving, or removing of buildings and other structures, or parts thereof, or additions or accessories thereto, or equipment therein, including methods of construction, reconstruction, installation, alteration, repair, razing, demolition, moving or removing, and the sufficiency of materials used in connection therewith, and also regulating the grading of and excavation of land and other changes in land or parts thereof, and also regulating the maintenance, operation, use and occupancy of all buildings and other structures and land, and all inspections thereof, and also regulating the height, area and bulk of all buildings and other structures and the density of population for the purpose of protecting the public health, safety and security of the people of the City of Baltimore."

"1032. *Responsibility of Owner.* The owner of any property covered by this Code shall be responsible for the compliance with all of the provisions of this Code in all matters or things pertaining directly or indirectly to such property. Such owner shall be held liable for all violations, of this Code in connection with any land, buildings, structure, or matter or thing owned or controlled by him. . . ."

"1033. *Responsibility of others.* Any person who violates any of the provisions of this Code shall be held liable for all such violations and shall be

subject upon conviction to all penalties prescribed herein for such violations in addition to the owner or owners of any property which may be involved."

"1400. *Required Permits and Issuance Thereof.* No matter, thing, operation or work mentioned in, regulated or provided for by any provisions of this Code shall be started or commenced, and no land, building or other structure shall be used for or in connection with any matter or thing mentioned in, regulated or provided for by any provisions of this Code, until and after a proper permit has been issued by and obtained from the Commissioner. . . ."

"1408. *Failure to comply with permit.* Failure to use the materials or the type or kind of equipment or the method of construction or the manner of installation approved by the Commissioner in any permit issued, or the failure to structurally comply with any and all of the requirements of an approved application and all other plans, drawings, specifications or any other approved data submitted with such applications, or the failure to comply with any of the requirements of this Code, shall constitute and be a violation of the permit issued, . . ."

"1902. *Procedure for Violations of Permits.* In the event that any land is altered, or building or other structure is built, started to be built, commenced in any way, used for or in connection with any matter or thing mentioned in, regulated or provided for by any provisions of this Code prior to the issuance of a proper permit by the Commissioner, the Commissioner shall order such work to be stopped immediately and no further work or operation shall be done or performed until and after the entire matter has been finally disposed of by the Commissioner. Such land, building, or other structure may not be used unless

it meets the requirements of this Code for the use involved and until a proper permit is in force.

"In all cases where a permit has been issued for the doing of any work or the performance of any operation and such work or operation is being done or performed in violation of any of the provisions of this Code or any of the terms and conditions which form a part of any issued permit or of any of the approved plans and specifications for such work or operation, the Commissioner is hereby authorized and empowered to stop such work or operation by notifying in writing the person to whom the permit has been issued, or the person who is doing or performing the work or operation, to immediately cease said work or operation, and upon the receipt of such notice, no further work or operation shall be done or performed until and after the person to whom the permit has been issued, or the person who is doing or performing the work or operation, has been again notified in writing by the Commissioner that he may proceed. Such violation shall subject the violator to the penalties and fines prescribed in this Chapter.

"The Commissioner is further authorized to order any work or operation, which was not done in accordance with the requirements of this Code, to be torn down, dismantled or removed, and no further work or operation shall be permitted until all such nonconforming work or operations has been corrected as ordered by the Commissioner."

"1922. *General Violations.* Any person (including, but not by way of limitation, any occupant or tenant), firm or corporation violating any of the provisions of this Code, or any lawful order, rule or regulation made or adopted pursuant thereto, shall be guilty of a misdemeanor. . . ."

"6000. *General Design.* All buildings and structures and parts thereof shall be designed by a method of rational analysis according to the

established principles of mechanics and engineering practices. They shall safely support and resist the dead loads, live loads and impact forces to which they may be subjected and as hereinafter required, and shall, in addition, be adequately braced against all lateral and all other forces to which they may be subject."

"6430. Metal Reinforcements used in concrete shall be billet steel, rail steel, axle steel, welded wire fabric, cold-drawn wire, and non-magnetic steel alloys or other materials that meet the requirements of this Section.

"Reinforcement made from scrap iron ingots or rerolled steel other than rail or axle steel shall not be used."

"6500. *General Requirements.* Reinforced concrete shall be designed by methods admitting of rational analysis according to established principles of mechanics, supplemented by the assumptions herein specified; to support loads and withstand the forces to which it is subject, without exceeding the stresses allowed in this Chapter for the various materials.

"Except as otherwise specifically provided in this Code or in rules duly promulgated by the Commissioner, the provisions of the 'Building Code Requirements for Reinforced Concrete' (A.C.I. 318-56 and Appendix), shall be deemed to be generally accepted good practice and to comply with the requirements and provisions of this Code pertaining to reinforced concrete design."

"6580. *General Requirements.* Precast reinforced concrete members shall be designed as required for other concrete members in this Chapter and, in addition, as required in this section.

"Precast concrete members shall be designed for construction stresses as well as for dead and live loads.

"Controlled concrete shall be used in all precast reinforced concrete.

"All sleeves or openings shall be in the concrete at the time of manufacturing and, except for slabs, no drilling or chipping will be permitted on the job.

"All precast concrete shall be subject to the approval of the Commissioner."

Initially, to determine what if any liability the Code places on the appellants, it must be determined whether the appellees were of the class of persons designed to be protected and that this injury was of the type of harm at which the statute was aimed. We find the language of § 1010 to be dispositive. It recites that the purpose of the act is to protect the public health, safety, and security of the people of Baltimore. This ordinance created a duty on the part of the appellants to erect the property in accordance with the Code. There can be no doubt that the appellees were members of the group the ordinance was designed to protect and that the violation of the ordinance constituted at least evidence of negligence. *State, Use of Parr v. Board of County Commissioners of Prince George's County,* 207 Md. 91, 113 A. 2d 397 (1955); *Gosnell v. B. & O. Railroad Co.,* 189 Md. 677, 57 A. 2d 322 (1948).

While the mere violation of a statute or ordinance will not support an action for damages, even though it is evidence of negligence, it is sufficient if the violation is the proximate cause of the injury. *Austin v. Buettner,* 211 Md. 61, 124 A. 2d 793 (1956).[1]

1. In Peterson v. Underwood, 258 Md. 9, 16, 264 A. 2d 851 (1970), Judge J. Dudley Digges, speaking for the Court, gave a most lucid definition of proximate cause in the following language:

"It should be clarified at this point that our inquiry is directed specifically to the issue of 'causation in fact' which has been regarded as an aspect of 'proximate cause.' W. Prosser, Handbook of the Law of Torts, § 41, at 240 (3d ed. 1964), 2 F. Harper and F. James, The Law of Torts, § 20.2, at 1110 (1956). Proximate cause ultimately involves a conclusion that someone will be held legally responsible for the consequences of an act or omission. This determination is subject to considerations of fairness or social policy as well as mere causation. Thus, although an injury might not have occurred 'but for' an antecedent act of the defendant, liability may not be imposed if for example the negligence of one

There was certainly sufficient evidence, which the appellees do not deny, to show that the collapse of the porch was a direct result of the defect in the concrete slab built in violation of the Code. The question becomes whether social policy and fairness will allow an imposition of liability on the appellants where their negligence was passive when opposed to the negligence of the subcontractor. If the statute imposes a strict liability on the owner and permit holder, then there is no distinction between active and passive negligence. Liability attaches if the violation of the Code was the cause of the injury.

Citing *Cutlip v. Lucky Stores*, 22 Md. App. 673, 677, 325 A. 2d 432 (1974), *cert. denied*, 273 Md. 719, the appellants state the old established rule that the employer of an independent contractor is not subject to liability for bodily harm caused to another by reason of a tort committed by the contractor. The rationale behind this rule is that the employer has no control over the acts of the independent contractor and in the case, as we have here, where the independent

person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury. Bloom v. Good Humor Ice Cream Co., 179 Md. 384, 18 A. 2d 592 (1941), or if the injury is so remote in time and space from defendant's original negligence that another's negligence intervenes. Dersookian v. Helmick, 256 Md. 627, 261 A. 2d 472 (1970); Liberto v. Holfeldt, 221 Md. 62, 155 A. 2d 698 (1959).

"Causation in fact is concerned with the more fundamental (and some have thought metaphysical) inquiry of whether defendant's conduct *actually* produced an injury. If lay testimony together with reasonable inferences does not directly show this causal relation (such as a witness's observing a brick hurled through a plate glass window) it may be shown in a number of other ways. The most familiar method today is through the opinion of the expert who states that, based on facts in evidence, X was the efficient cause of the injury. Such opinion testimony is not always required, and the plaintiff produces legally sufficient proof to get to the jury once he shows it is more probable than not that defendant's act caused his injury. Wilhelm v. State Traffic Comm., 230 Md. 91, 185 A. 2d 715 (1962); Otis Elevator v. LePore, 229 Md. 52, 57, 181 A. 2d 659 (1962). This does not mean plaintiff is required to exclude every other possible cause of the accident. State of Maryland v. Manor Real Estate & Trust Co., 176 F. 2d 414 (4th Cir. 1949); Wilson v. Blaustein, 144 Md. 289, 124 A. 886 (1924). But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff can not recover. Langville v. Glen Burnie Lines, 233 Md. 181, 195 A. 2d 717 (1963); Joffre v. Canada Dry, Inc., 222 Md. 1, 158 A. 2d 631 (1960)."

contractor's negligence causes injury from a latent defect, the owner and general contractor would have no knowledge of the negligence. Appellants contend that as they had no knowledge of or control over the defective concrete slab they should not be subject to liability. In *Cutlip, supra* at 677 we stated that the established rule has appended to it some twenty exceptions as set out in the *Restatement* (Second) *of Torts* §§ 410-429. Section 424 has particular application to this case:

"§ 424. *Precautions Required by Statute or Regulation*

"One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

See also Comment b.:

"b. Statutes and regulations of the kind described are of two types. One type of statute or regulation imposes upon those doing the work an absolute duty to see that the specified safeguards or precautions are provided. The other type imposes merely a duty to use reasonable care to provide them. Whether a statute or regulation is of one type or the other is a matter of construction of the particular provision.

"If the duty imposed is an absolute one, the employer is subject to liability for the failure of the contractor to provide the required safeguard or precaution, even though the contractor has exercised all reasonable care in his effort to do so. On the other hand, if the duty imposed is only one of reasonable care, the employer is subject to

liability only if the contractor has failed to exercise such care. . . ."

Attaching the ordinary meaning to the words in § 1032 and § 1408, it is apparent to us that the City Council, in order to achieve their purpose of protecting the residents of Baltimore, has affirmatively placed the responsibility of compliance with the Building Code on the owner and permit holder. This does not mean that an owner-permit holder is liable for every injury which happens on his premises, but it does make him responsible for injuries caused by the failure to comply with the Code. We hasten to add that this liability only attaches to those situations where the owner has title at the time the structure is built. He is in a position to oversee the work and insure compliance with the Building Code. It would not apply to a subsequent owner who would not be in a position to check compliance with the Code. This duty expressly imposed by the council cannot be delegated. Non-delegable duties arise in situations in which the law deems a particular duty "so important and so peremptory that it will be treated as non-delegable. . . . Duties imposed by statute are often found to be of this kind. . . ." 2 Harper & James, *The Law of Torts* § 26.11 at 1406 (1956).

The questions of to what extent a city building ordinance changes and supersedes the common law relation between landlord and tenant, and when a landowner's liability to his tenants for negligent construction ceases were specifically reserved by the Court of Appeals in *Peterson v. Underwood, supra* at 21. We also note that prior decisions of the Court of Appeals may indicate a contrary philosophy than we have expressed. For example, *see Bona v. Graefe,* 264 Md. 69, 285 A. 2d 607 (1972) and *Thomas v. Cryer,* 251 Md. 725, 248 A. 2d 795 (1969).

On the other hand, the Court of Appeals has recently adopted the theory of strict liability in the manufacture and sale of defective products. *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A. 2d 955 (1976). There is an indication that this theory applies to the case at bar. As stated by Professor William Prosser in his *Handbook of the Law of Torts* (4th

ed. 1971), page 680: "The liability of building contractors has tended to follow the same general path of development as that of suppliers of chattels, but to lag behind it by some twenty years." He stated futher at 682:

"Reference has already been made to the direct 'warranty' of the builder of a new house to the initial buyer to whom he sells it. The analogy of the manufacturer of chattels led more or less inevitably to the extension of this strict liability to third persons. In 1965, in Schipper v. Levitt & Sons, Inc.,[11] New Jersey again led off by holding that the warranty protected a child of the buyer, injured by a defective water heating apparatus. The decision has since been followed in California,[12] Florida,[13] and Mississippi,[14] with dicta in two or three other jurisdictions approving it.[15] Again the prediction is easily made, that this too is rapidly to become the prevailing rule."

"11.  1965, 44 N.J. 70, 207 A.2d 314.

"12.  Kriegler v. Eichler Homes, Inc. 1969, 269 Cal. App. 2d 224, 74 Cal. Rptr. 749. This was followed, as to the land itself, in Avner v. Longridge Estates, 1969, 272 Cal. App.2d 695, 77 Cal. Rptr. 633.

"13.  Calvera v. Green Springs, Inc., Fla. App. 1969, 220 So.2d 414.

"14.  State Stove Mfg. Co. v. Hodges, Miss. 1966, 189 So.2d 113, cert. denied 386 U.S. 912.

"15.  See Bethlahmy v. Bechtel, 1966, 91 Idaho 55, 415 P.2d 698; Humber v. Morton, Tex. 1968, 426 S.W.2d 554."

Some courts in addition to those cited by Professor Prosser, have adopted the rule as to sellers of new houses. *Rogers v. Scyphers*, 161 S.E.2d 81 (S. Carolina 1968); *Fisher v. Simon*, 15 Wis. 2d 207, 112 N.W.2d 705 (1961); *McDonough v. Whalen*, 365 Mass. 506, 313 N.E.2d 435 (1974). It has also

been applied to lessors of a product. *Cintrone v. Hertz Truck Leasing,* 45 N. J. 434, 212 A. 2d 769 (1965).

While we decline to decide this case on those grounds as the question was not raised or argued by either side, it does appear that the Court of Appeals has adopted the policy of protecting the consumers when they are not in a position to protect themselves.[2] The Court stated in *Phipps, supra,* that the reasons for adopting strict liability for the manufacturer and seller of defective products were (1) that the cost of injuries should in equity be borne by those who manufacture or sell such products rather than the injured person who was powerless to protect himself; (2) because it shifts the loss to those better able financially to bear the loss; (3) that the consumer relies on the seller in expecting the product to be safe for the uses for which it has been marketed and the expectation is better fulfilled by strict liability than negligence or warranty theories. Although not applicable to the instant case the fourth reason would be a reason to apply the rule in most cases; (4) the showing that the product is unreasonably dangerous is a sufficient showing of fault to impose liability without placing an almost impossible burden on the plaintiff of proving specific acts of negligence. The same reasoning would apply to the tenant in the case at bar. She was powerless to determine whether the premises were safe. For these reasons we find that the Building Code places a non-delegable, affirmative duty on the owner-permit holder at the time of construction, to insure compliance with the Code. *See McCoy v. Coral Hills Associates, Inc.,* 264 A. 2d 896 (D.C. App. 1970) and *Leimbach v. Bickford's, Inc.,* 214 Md. 434, 442, 135 A. 2d 633 (1957). *But see Rigger v. Balt. Co.,* 269 Md. 306, 311, 305 A. 2d 128 (1973).

## Court's Instructions

Appellants argue that the instructions given by the trial judge were confusing. While we agree that they were not a model of clarity, the jury was instructed several times that if they found a violation of the ordinance that that was

---

**2.** We limit our holding to the adoption of § 424 of Restatement (Second) of Torts.

evidence of negligence, but that they could not find for the plaintiffs unless, in addition, they found that the violation was the proximate cause of the accident. As we have previously indicated, under our interpretation of the present state of the Maryland law the instruction was more favorable to the appellants than one of strict liability for violations of the Building Code, under § 424 of the *Restatement.*

### Negligence of Independent Contractor Imputed to Owner-Builder

Under this heading the appellants argue that the trial judge's instructions based on *Deford v. State, Use of Keyser,* 30 Md. 179 (1869), was in error. The instruction read:

> "[W]here the thing contracted to be done causes the injury and the injury can be said to arise from the authority of the employer because this thing contracted to be done is imperfectly performed, then the employer must be taken to have authorized the act and is responsible for it."

We agree that this instruction imposed strict liability for the latent defect on the appellants and is not supportable under *Deford* because in that case the wall constructed under the owner's contract was fronting on a public street in a large city and in an obviously most defective and dangerous manner, "so much so, that it excited the alarm and apprehension of hundreds of people as they passed, and caused them to avoid the pavement in its immediate front." *Id.* at 204. We find, however, that the instruction was no more than the court should have granted under § 424 of the *Restatement* and §§ 1032 and 1408 of the Building Code.

### Appellants' Claim Against Luciano

We entirely agree with the appellants' argument that their negligence, if any, was passive and the negligence of the cross-defendant, Luciano, was active, and therefore the court should have granted relief to Garden for indemnification against Luciano. *See Pennsylvania*

*Threshermen & Farmers' Mutual Casualty Insurance Co. v. Travelers Insurance Co.*, 233 Md. 205, 196 A. 2d 76 (1963) and *C. & O. C. Co. v. County Commissioners*, 57 Md. 201 (1881).

> *Judgments of appellees against appellants affirmed.*
>
> *Judgment entered for Garden-village Realty Corporation against Alex Luciano and Alex Luciano Co., Inc. in the amount of appellees' judgments against the appellants.*
>
> *Appellants to pay the costs.*