835 A.2d 616

Sean BROOKS, A Minor, et al.,

v.

**LEWIN REALTY III, INC.**

**No. 60, Sept. Term, 2001.**

Court of Appeals of Maryland.

Nov. 13, 2003.

Harvey S. Wasserman (Saul E. Kerpelman, on brief), of Baltimore, for petitioners.

Saul E. Kerpelman (Saul E. Kerpelman & Associates, P.A., on brief), of Baltimore, for petitioners.

Frank F. Daily (Cynthia Dietz Spirt of Law Offices of Frank F. Daily, P.A., on brief), of Hunt Valley, for respondents.

Frank F. Daily, (Cynthia Dietz Spirt of the Law Offices of Frank F. Daily, P.A., on brief), of Hunt Valley, for respondents

Argued and Reargued before BELL, C.J. ELDRIDGE RAKER WILNER CATHELL HARRELL BATTAGLIA, JJ.

ELDRIDGE, Judge.

We granted a petition for a writ of certiorari in this case to clarify the notice requirement in lead paint poisoning negligence actions based upon violations of the Baltimore City Housing Code. We shall hold that, in the context of a tort action against a Baltimore City landlord, based upon a child's consumption of lead-based paint which was present in the form of flaking, loose, or peeling paint in the leased premises, in violation of the Housing Code, the plaintiff does not have to show that the landlord had notice of the violation to establish a *prima facie* case. To the extent that our opinions in *Richwind v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994), and its progeny, are inconsistent with this holding, those opinions are modified or overruled.

## I.

The following facts were set forth in the Court of Special Appeals' opinion, *Lewin Realty III, Inc. v. Brooks,* 138 Md. App. 244, 255–256, 771 A.2d 446, 452–453 (2001) (footnote omitted):

"In August 1988, Shirley Parker rented a house at 1202 North Patterson Park Avenue, in Baltimore City. Fresh paint was applied to the interior of the house at the beginning of the tenancy.

"Sharon Parker, Shirley Parker's daughter, moved into the North Patterson Park Avenue house ('the House') soon after her mother rented it. On December 6, 1989, Sharon gave birth to Sean, the minor appellee, who lived there too.

"Sometime in February or March 1991, when Sean was slightly more than a year old, Lewin [Realty] purchased the House at auction. Lewin is owned by four stockholders, one of whom is Marvin Sober. * * * Mr. Sober is in charge of managing the company and conducting its day to day business. Before Lewin purchased the House, Mr. Sober went on a 'walk through' inspection of it. Sharon was present when the 'walk through' took place, and accompanied Mr. Sober as he inspected the House. Sharon testified that at

the time of the 'walk through,' there was peeling, chipping, and flaking paint present in numerous areas of the interior of the House, including in Sean's bedroom.

"After Lewin purchased the House, it entered into a new lease with Shirley. It did not re-paint the interior of the House at that time.

"In February 1992, Sean was diagnosed with an elevated blood lead level. Four months later, in May 1992, a nurse from the Baltimore City Health Department ('BCHD') came to the House and spoke to Sharon about Sean's elevated blood lead level. Sharon testified that she first learned about Sean's condition at that time. That same month, the BCHD issued a lead paint violation notice for the property to Lewin. The House was inspected and found to contain 56 areas of peeling, chipping, and flaking lead paint."

Sharon Parker filed a five-count complaint individually and on behalf of her minor son, Sean, against Lewin Realty. The complaint alleged negligence with regard to Sean (count one), negligence with regard to Ms. Parker (count two), violation of the Maryland Consumer Protection Act (count three), strict liability in tort (count four), and sought punitive damages (count five). Pursuant to the respondent's motion to dismiss, the Circuit Court for Baltimore City dismissed counts four and five. The respondent then filed a motion for summary judgment as to the remaining counts in the complaint. The Circuit Court granted the motion for summary judgment with respect to the Consumer Protection Act, strict liability in tort and punitive damages, but denied the motion as to the negligence counts. Subsequently, upon the petitioner's motion, the trial court also dismissed count two of the complaint which pertained to Sharon Parker's individual claim.

The remaining negligence count was based on several grounds, including, *inter alia:* (a) Lewin Realty's violation of the Baltimore City Code; (b) Sean's exposure to an unreasonable risk of harm from the lead-based paint while Lewin Realty knew that its dangerous properties were not known to Sean and not discoverable in the exercise of reasonable care;

(c) Lewin Realty's failure to exercise reasonable care in properly maintaining the walls, doors, and ceilings after Lewin Realty had actual and constructive knowledge of the flaking paint condition; and (d) Lewin Realty's failure to exercise reasonable care to inspect the dwelling's paint when a reasonable inspection would have revealed the flaking paint condition.

The case proceeded to trial. Before trial, Lewin Realty had moved *in limine* to exclude from the evidence five documents, each entitled "Emergency Violation Notice and Order to Remove Lead Nuisance." These violation notices, which were issued at various dates in the 1980's, pertained to other properties which were not involved in this case. The notices were issued by the Baltimore City Health Department to Mr. Sober and the companies with which he was associated at the time. Lewin Realty argued that the notices were not relevant, were inadmissible as "other bad acts" evidence, and were overly prejudicial. While perhaps relevant to the matter of Lewin Realty's knowledge of the health hazards of lead paint, Lewin argued that, because Mr. Sober testified to having such knowledge at the relevant time, the issue was not contested and therefore the notices were not relevant. The court denied the motion *in limine,* and the notices were admitted into evidence at the trial.

The jury found that Lewin Realty was liable under count one and awarded damages totaling $750,000. After the Circuit Court denied Lewin Realty's Motion for Judgment Notwithstanding the Verdict, Lewin Realty took an appeal to the Court of Special Appeals. The arguments made to the intermediate appellate court centered upon the admission of the violation notices pertaining to the unrelated properties. The Court of Special Appeals reversed and remanded the case for a new trial, holding that the admission of the notices pertaining to the unrelated properties was prejudicial error.

This Court granted the plaintiffs' petition for a writ of certiorari, *Brooks v. Lewin Realty,* 365 Md. 266, 778 A.2d 382 (2001). After the initial briefing and oral argument before

this Court, we issued an order directing the parties to file supplemental briefs and setting the case for reargument on a matter not previously dealt with by the parties or the courts below. Our order had the effect of amending the previous order granting certiorari and adding an issue or issues to the case. *See Robinson v. Bunch,* 367 Md. 432, 439–441, 788 A.2d 636, 641–642 (2002), and cases there cited; Maryland Rule 8–131(b). The order for supplemental briefs and reargument pointed out that language in *Richwind v. Brunson, supra,* 335 Md. at 674 675, 645 A.2d at 1153–1154, and *Brown v. Dermer,* 357 Md. 344, 361–362, 744 A.2d 47, 57 (2000), requires, for landlord liability in a case like the one at bar, that the plaintiff has the burden of pleading and proving that the landlord knew or had reason to know of the defective condition, *i.e.,* the existence of flaking, loose, or peeling paint. The order also pointed out that in *Richwind v. Brunson, supra,* 335 Md. at 674, 645 A.2d at 1153, the Court indicated that the landlord has no "duty to periodically inspect the premises during the leased period for dangerous conditions to determine if repairs are necessary." The order requested the parties "to address whether this Court should reconsider and modify the above-[described] requirements and standards applicable in personal injury actions against landlords based on alleged lead-based paint poisoning in leased residential property." More specifically, the order directed the parties to consider the following:

"1.   Whether a landlord should have a duty to inspect the premises, either at the inception of the lease or during the lease period, to determine wither there exists a flaking, loose, or peeling paint condition, or a lead-based paint condition, which should be abated;

"2.   Whether plaintiffs in these types of actions should have the burden of pleading and establishing that the landlords had notice of a defective condition involving flaking, loose or peeling paint, or the presence of lead-based paint;

"3.   Whether, when there is a dangerous lead-based paint condition in leased residential property, the landlord

should, as a matter of law, be presumed to have notice
of the dangerous condition."

Although set forth in three separate paragraphs, the above-
quoted language does not present three separate and distinct
issues.

## II.

If this Court holds that the plaintiff, in cases such as this,
need not prove that the landlord had notice of a defective
condition involving flaking, loose, or peeling paint, or involving
lead-based paint, and that, as a matter of law, the landlord
should be presumed to have knowledge of the dangerous
condition, then the violation notices which were admitted into
evidence in this case would be clearly irrelevant to the issues
of liability and compensatory damages. The landlord's knowl-
edge would be a non-issue. Consequently, under this scenar-
io, we would affirm the Court of Special Appeals' order for a
new trial, although on a different ground than that relied upon
by the intermediate appellate court.

Before this Court, the petitioners essentially argue that
*Richwind v. Brunson, supra,* "incorrectly imported the princi-
ples of two distinct common law lines of cases—breaches of
covenants to repair and failure to warn of known latent
defects—both of which require notice to an alleged tortfea-
sor—into the consideration of ... liability for injuries result-
ing from an alleged tortfeasor's violation of a statute or
ordinance." (Petitioners' supplemental brief at 1). The peti-
tioners assert that these common law rules, which require that
the landlord have notice or knowledge of a defective condition,
only apply in the absence of a controlling statutory scheme.

The petitioners further contend that the Baltimore City
Housing Code provides the controlling standards in the in-
stant case and that, under Maryland law, Lewin Realty's
violation of the Housing Code is evidence of negligence. Thus,
petitioners reason, under ordinary tort principles, if such
negligence proximately causes an injury, it will give rise to a
cause of action for damages despite a lack of notice or

knowledge on the alleged tortfeasor's part. The petitioners state (*id.* at 7, 33, 645 A.2d 1147):

"[I]n order to make out a *prima facie* case all that a plaintiff must show is the violation of an ordinance, that the violation proximately caused an injury, and that the injured plaintiff was in a class of people intended to be protected by the ordinance. * * * The *prima facie* case makes out a cause of action for negligence which the plaintiff is entitled to have submitted to a trier of fact for determination as to negligence.

* * *

"It is for a trier of fact to evaluate whether the steps taken by the landlord to ensure his required compliance with the Code were reasonable under all the circumstances proven in the case."

Moreover, the plaintiffs argue that they should not bear the burden of proving that the alleged tortfeasor was aware that he or she was violating the law, since "[i]t is the proven fact of the existence of the violation alone which is evidence of negligence." (*Id.* at 8, 645 A.2d 1147). Thus, the petitioners continue, "proof of notice to the landlord of his violation of law should not be part of the plaintiff's burden of proof. . . ." *Ibid.* With regard to a landlord's duty to inspect the premises for a defective lead-paint condition, the petitioners argue that the landlord's duties under the Housing Code cannot be satisfied without periodic inspections. The petitioners urge that landlords who do not perform periodic inspections should be charged with the knowledge of what a reasonable inspection would have revealed.

The respondent's arguments focus on the landlord's alleged lack of control over the premises during the tenancy. Stating that "notice [is] a precursor to liability, particularly given that a landlord surrenders control when leasing a property" (respondent's supplemental brief at 18), the respondent asserts that the issues addressing the duty to inspect and burden of proof as to notice both "depend to a large extent on the

fundamental notion of control" of the premises during a tenancy. *Id.* at 18, 3). The respondent also argues that, since neither the common law nor any statute or ordinance expressly requires inspections during the tenancy, the Court should not impose such a duty.

### III.

### A.

As the parties point out, under the common law and in the absence of a statute, a landlord ordinarily has no duty to keep rental premises in repair, or to inspect the rental premises either at the inception of the lease or during the lease term. There are, however, exceptions to this general rule.

Moreover, where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff, another well-settled Maryland common law rule has long been applied by this Court in negligence actions. That rule states that the defendant's duty ordinarily "is prescribed by the statute" or ordinance and that the violation of the statute or ordinance is itself evidence of negligence. *Brown v. Dermer, supra,* 357 Md. at 358–359, 744 A.2d at 55. Almost ninety years ago, our predecessors in *Flaccomio v. Eysink,* 129 Md. 367, 380, 100 A. 510, 515 (1916), held that "the violation of a statue … is itself sufficient to prove such a breach of duty as will sustain a private action for negligence, … and that the true rule in such cases is that the violation is presumptive evidence of negligence." *See, e.g., Absolon v. Dollahite,* 376 Md. 547, 553, 831 A.2d 6, 9 (2003); *Bentley v. Carroll,* 355 Md. 312, 325–326, 734 A.2d 697, 704–705 (1999); *County Commissioners v. Bell Atlantic–Maryland,* 346 Md. 160, 179, 695 A.2d 171, 181 (1997); *Dennard v. Green,* 335 Md. 305, 315–316, 643 A.2d 422, 427 (1994); *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 155, 642 A.2d 219, 229 (1994); *Atlantic Mutual v. Kenney,* 323 Md. 116, 124, 591 A.2d 507, 510–11 (1991); *Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232, 234 (1991); *Volkswagen of America v. Young,* 272 Md. 201, 218, 321 A.2d 737, 746 (1974); *Hilton v. Williams,* 258

Md. 285, 289, 265 A.2d 746, 748 (1970); *Khoyan v. Turner,* 255 Md. 144, 147, 257 A.2d 219, 220 (1969); *McLhinney v. Lansdell Corp. of Maryland,* 254 Md. 7, 14–15, 254 A.2d 177, 181 (1969); *Paramount Development Corp. v. Hunter,* 249 Md. 188, 193, 238 A.2d 869, 871 (1968); *Aravanis v. Eisenberg,* 237 Md. 242, 259–260, 206 A.2d 148, 158 (1965); *Alston v. Forsythe,* 226 Md. 121, 130, 172 A.2d 474, 477–478 (1961); *Ford v. Bradford,* 213 Md. 534, 541, 132 A.2d 488, 491–492 (1957); *Austin v. Buettner,* 211 Md. 61, 70, 124 A.2d 793, 798 (1956); *State v. Prince George's County,* 207 Md. 91, 103, 113 A.2d 397, 402 (1955); *Campbell v. State,* 203 Md. 338, 343, 100 A.2d 798, 801 (1953); *Williams v. Graff,* 194 Md. 516, 521, 71 A.2d 450, 452 (1950); *Gosnell v. B. & O.R.R. Co.,* 189 Md. 677, 687, 57 A.2d 322, 327 (1948).

▮ Under this principle, in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of. "Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. * * * It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence." *Brown v. Dermer, supra,* 357 Md. at 359, 744 A.2d at 55.

▮ Where there is evidence that the violation of the statute proximately caused the plaintiff's injury, evidence of such violation "is sufficient evidence to warrant the court in submitting the case to the jury on the question of the [defendant's] negligence," *Crunkilton v. Hook,* 185 Md. 1, 4, 42 A.2d 517, 519 (1945). The trier of fact must then evaluate whether the actions taken by the defendant were reasonable under all the circumstances. *See also, e.g., Austin v. Buettner, supra,* 211 Md. at 70, 124 A.2d at 798 (Evidence that stairs were in violation of the Anne Arundel County building code, coupled with evidence showing that the violation was the proximate

cause of the plaintiff's injury, was sufficient to support an action for damages); *Campbell v. State, supra,* 203 Md. at 343, 100 A.2d at 801 (Violation of a statute which proximately causes the injury "is legally sufficient evidence to warrant the court in submitting the case to the jury on the question of the [defendant's] negligence"); *Gosnell v. B. & O.R.R. Co., supra,* 189 Md. at 687, 57 A.2d at 327 ("[I]t is ... well settled that where such a violation [of a statute or ordinance] is the proximate cause of an injury a right of action does accrue to the party injured").

We stress that none of the above-cited cases imposes upon the plaintiff the additional burden of proving that the defendant was aware that he or she was violating the statute or ordinance. Depending upon the statute and the particular sanction involved, knowledge, and the type thereof, may or may not be pertinent in establishing whether or not there was a statutory violation.[1] Nevertheless, once it is established that there was a statutory violation, the tort defendant's knowledge that he or she violated the statute is not part of the tort plaintiff's burden of proof. It is the violation of the statute or ordinance alone which is evidence of negligence.

This rule has been stated in the context of landlords and tenants in the Restatement (Second) of Property, Landlord and Tenant § 17.6 (1977), and cited with approval by this Court in lead paint premises liability cases. *See Benik v. Hatcher,* 358 Md. 507, 526–527 n. 11, 750 A.2d 10, 21 n. 11 (2000), and *Brown v. Dermer, supra,* 357 Md. at 361 n. 5, 744 A.2d at 56 n. 5. Section 17.6 of the Restatement (Second) of Property provides (emphasis added):

"A landlord is subject to liability for physical harm caused to the tenant ... by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:

---

1. *See, e.g., Deibler v. State,* 365 Md. 185, 192–201, 776 A.2d 657, 661–666 (2001); *Perry v. State,* 357 Md. 37, 62–69, 741 A.2d 1162, 1176–1179 (1999).

(1) an implied warranty of habitability; or

(2) *a duty created by statute or administrative regulation.*"

In the instant case, the Housing Code, Baltimore City Code (2000 Repl.Vol.), Art. 13, §§ 101 *et seq.,* imposes numerous duties and obligations upon landlords who rent residential property to tenants. The plaintiffs are obviously within a class of persons which the Housing Code was designed to protect. *Brown v. Dermer, supra,* 357 Md. at 367, 744 A.2d at 60 ("Patently, by enacting §§ 702 and 703 of the Housing Code, the City Council sought to protect children from lead paint poisoning by putting landlords on notice of conditions which could enhance the risk of such injuries"). Under the established principles of Maryland tort law set forth in the previously cited cases, if the plaintiffs can establish a violation of the Housing Code which proximately caused Sean's injuries, then the plaintiffs are entitled to have count one of their complaint submitted to the trier of facts. Under the above-cited cases, the plaintiffs need not prove that Lewin Realty had notice of the Housing Code violation.

### B.

We turn now to the pertinent provisions of the Housing Code. The Code contains a comprehensive statutory scheme aimed at "establish[ing] minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings ... in order to make dwellings safe, sanitary, and fit for human habitation."[2] § 103(a)(2). Moreover, § 103(b) states that "[t]his Code is hereby declared to be remedial ... and it is the intention of the Mayor and City Council that this Code be liberally construed to effectuate [its] purposes."

Generally, the Housing Code requires that a dwelling be kept in "good repair" and "safe condition." Section 702 of the Housing Code provides, in pertinent part, as follows:

---

**2.** While the Housing Code regulates the safety of various aspects of a dwelling, our discussion focuses on the Code's requirements with regard to the interior surfaces of a dwelling.

" § 702.   Good repair and safe condition.

(a) *In general.*

Every building ... occupied as a dwelling shall, while in use ..., be kept in good repair, in safe condition, and fit for human habitation."

In regard to rental property, § 1001 prohibits a landlord from leasing a dwelling that violates the Housing Code:

" § 1001.   Prohibited occupancy.

(a) *In general.*

(1) No owner shall lease ... any vacated ... dwelling or dwelling unit which does not comply with the provisions of this Code...."

Additionally, § 310 places the responsibility of complying with the Code squarely upon the owner or operator of a property:

" § 310.   Responsibility for compliance with Code.

(a) *Responsibility of owners and operators.*

(1) Any person who is either an owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of the Code."[3]

The division of responsibilities between an "owner" or "operator" and an "occupant" is further defined by Chapter 9 of the Housing Code, which prescribes the occupant's responsibilities.[4] Chief among the occupant's responsibilities is to keep the dwelling in a "clean and sanitary condition," § 902(a), which is generally defined in § 902(b) as keeping the premises free of dirt and filth.

The removal of flaking, loose, or peeling paint is mandated in two separate sections of the Housing Code in order for a

---

3. "Owner" is defined in § 105(jj) as "any person ... who ... owns, holds, or controls ... title to any dwelling ... with or without accompanying actual possession thereof...." The Housing Code defines "operator" in § 105(hh) as "any person who has charge, care, or control of a building ... in which dwelling units ... are let or offered for occupancy...."

4. The term "occupant" is defined in § 105(gg) as "the person who actually uses or has possession of the premises."

dwelling to be deemed in "good repair" or "safe condition." First, § 703 provides, in relevant part as follows (emphasis added):

" § 703.   **Standards for good repair and safe condition.**

(a) *In general.*

Good repair and safe condition shall include but is not limited to the following standards.

* * *

(b) *Interiors.*

* * *

(3) All walls, ceilings, woodwork, doors and windows *shall be kept clean and free of any flaking, loose, or peeling paint. ...*"

Next, § 706(b) mandates the removal of loose and peeling paint from interior walls and requires that any new paint applied to the interior surfaces be free of lead (emphasis added):

" § 706.   **Painting.**

* * *

(b) *Interiors.*

(1) All interior *loose or peeling* wall covering or *paint shall be removed* and the exposed surface shall be placed in a smooth and sanitary condition.

(2) No paint shall be used for interior painting of any dwelling ... unless the paint is free from any lead pigment."

In addition to § 703(b)(3)'s mandate that all interior surfaces "shall be *kept* clean and free of any flaking, loose, or peeling paint," § 702(a) requires that "a dwelling shall, *while in use ...*, *be kept* in good repair, in safe condition, and fit for human habitation." (Emphasis added).

Thus, under the plain meaning of the Code's language, it is clear that the Mayor and City Council of Baltimore mandated

a *continuing* duty to keep the dwelling free of flaking, loose, or peeling paint, *at all times* "while [the dwelling is] in use," in order for the landlord to remain in compliance with the Housing Code. The nature of the landlord's duty is continuous. The Housing Code does not limit the landlord's duty to keep the premises free of flaking paint to a one-time duty at the inception of the lease. The landlord must take whatever measures are necessary during the pendency of the lease to ensure the dwelling's continued compliance with the Code.

To facilitate such continuous maintenance of the leased premises, § 909 explicitly grants a right of entry to the landlord to ensure that he or she can "mak[e] such inspection[s] and such repairs as are necessary" to comply with the Housing Code. It states:

" § 909. Access for repairs.

Every occupant of a dwelling . . . shall give the owner thereof . . . access to any part of such dwelling . . . at all reasonable times for the purpose of making such inspection and such repairs or alterations as are necessary to effect compliance with the provisions of this Code. . . ."

Although this section may not explicitly require the landlord to perform periodic inspections, it grants such right to the landlord and shows that the City anticipated that periodic inspections might be necessary to comply with the Code.

The respondent nonetheless urges that "[d]uring a tenancy . . . the landlord surrenders control of the property and, in doing so, surrenders the ability, at least in some respects, to prevent a violation of the housing code during the tenancy." (Respondent's supplemental brief at 21–22). Lewin Realty's principal argument is that the landlord has no ability to control the condition of the interior surfaces of the premises during the tenancy. We disagree. Contrary to the respondent's argument, § 909 vests the landlord with sufficient control of the leased premises during the tenancy to inspect and to rectify a condition of flaking, loose, or peeling paint.

Furthermore, contrary to Lewin Realty's statements in its brief, our holding in the instant case does not impose a strict

liability regime upon landlords. Whether Lewin Realty is held liable for an injury to a child, based on lead paint poisoning, will depend on the jury's evaluation of the reasonableness of Lewin Realty's actions under all the circumstances.[5]

Lewin Realty also contends that "the imposition of a duty to inspect during [the] tenancy would create a minefield of difficulties." (Respondent's supplemental brief at 15). The respondent's concerns that a landlord will be required to "inspect[ ] the property every day, three times a week, twice a week, twice a month, once a month . . ." are without basis. (*Id.* at 16, 744 A.2d 47.) The nature of the defective condition in question—a flaking, loose, or peeling paint condition—is a slow, prolonged process which is easily detected in the course of reasonable periodic inspections. As the respondent concedes, "[w]e know that paint in a property will chip-it is just a matter of time." (*Id.* at 22, 744 A.2d 47). It does not occur overnight.

In addition, Lewin Realty raises doubts about the ability to quantify the dangerousness of a lead paint condition: "Is one area in a far corner of a property a 'dangerous condition'? * * * Is the presence of lead-based paint in the eighth layer

---

**5.** Judge Raker's dissenting opinion states that "[t]he majority's new rule means that the landlord will be forced to defend the case in court even if the plaintiff concedes that the landlord behaved reasonably in not knowing about a Code violation." The dissenting opinion further asserts that the majority's interpretation of the Baltimore City Housing Code "essentially imposes strict liability upon landlords and makes landlords the insurers of litigants...." These statements are flatly incorrect. Our opinion makes clear that (a) where there is a violation of a statute designed to protect a class of persons which includes the plaintiff, and (b) where that violation proximately causes the plaintiff's injury, a prima facie case is established. At this point, the fact-finder must determine whether the landlord acted reasonably under all the circumstances. This is the essence of a negligence action, as "negligence is a failure to do what the reasonable [person] would do 'under the same or similar circumstances.'" William L. Prosser, *The Law of Torts*, § 32 at 151 (4th ed.1971). If the plaintiff concedes reasonableness, then there is nothing for the jury to try. No strict liability regime is established, since the jury must still determine reasonableness under the circumstances.

of paint, covered by seven non-leaded layers of paint, a hazardous condition when present on a windowsill as opposed to the upper far corner of a wall?" (*Id.* at 26, 744 A.2d 47). In a negligence case, such as the case at bar, the simple answer to these questions is that it will be the duty of the trier of fact to determine whether the steps taken by the landlord to ensure continued compliance with the Code, *i.e.*, the frequency and thoroughness of inspections, and the maintenance of the interior surfaces of the dwelling, were reasonable under all the circumstances. The test is what a reasonable and prudent landlord would have done under the same circumstances.

Finally, Lewin Realty suggests that a tenant might object to the landlord's need to inspect the premises. That concern is allayed by the fact that the Housing Code *requires* the tenant to give the owner access to the premises "at all reasonable times for the purpose of making such inspection[s] . . . as are necessary to effect compliance with the provisions of this Code." § 909.

## IV.

We recognize that our holding in the instant case is in conflict with part of this Court's opinion in *Richwind v. Brunson, supra,* 335 Md. 661, 645 A.2d 1147.

The *Richwind* opinion, 335 Md. at 670–672, 645 A.2d at 1151–1152, recognized that a statutory scheme may impact common law principles governing the relationship between landlord and tenant, that a violation of the Baltimore City Housing Code may constitute evidence of negligence, and that "a private cause of action in a landlord/tenant context can arise from a violation of any statutory duty or implied warranty created by the Baltimore City Code." The *Richwind* opinion continued (335 Md. at 672, 645 A.2d at 1152): "If Richwind violated one of the city code provisions, that violation could provide the basis for a negligence action against it and its agent. . . ." The *Richwind* opinion further acknowledged that a statute or ordinance could supersede the common law princi-

ple " 'that a landlord's liability for negligence depends upon notice of a particular defect and a reasonable opportunity to correct it.' " 335 Md. at 670, 645 A.2d at 1151. Finally, the *Richwind* opinion quoted §§ 702 and 703 of the Baltimore City Housing Code which mandate that a landlord must keep the premises "in safe condition" and must keep them "free of any flaking, loose or peeling paint," 335 Md. at 670–671, 645 A.2d at 1151. The opinion then stated (335 Md. at 671, 645 A.2d at 1151):

"Thus, a landlord leasing property in Baltimore City is under a statutory obligation to correct such a hazardous condition even in the absence of a contractual duty to do so."

Nevertheless, the opinion in *Richwind* took the position that the Baltimore City Housing Code did not modify the common law notice requirement because of §§ 301(a) and 303 of the Housing Code. Specifically, § 301(a) provides:

" § **301.  Violation notices.**

(a) *Commissioner to issue.*

Whenever the Commissioner of Housing and Community Development determines that there has been a violation of any provision of this Code or of any rule or regulation adopted pursuant hereto, he shall give notice of such alleged violation to the person or persons responsible therefor as hereinafter provided."

Section 303 requires the Commissioner to "order the necessary corrections by notice and service." The opinion reasoned that "[e]ach of these sections therefore provides that the landlord must be served with notice and afforded a reasonable opportunity to correct the defective condition." 335 Md. at 673, 645 A.2d at 1152.

The flaw in the *Richwind* opinion's analysis is its extension of §§ 301 and 303's notice requirements to occupants. The Baltimore City Housing Code does not, in any of its provisions, require the tenant, or, in the Code's parlance, the occupant, to furnish the landlord with notice of a defective condition on the premises. *Richwind* relied on the provisions in Chapter 3 of the Housing Code to support the notion that

the Housing Code requires the notice to the landlord as a precursor to liability for negligence. These provisions address the typical requirements incumbent upon an administrative agency (here, the Department of Housing and Community Development) before the *agency* may act upon a violation in an administrative proceeding. They provide for the normal procedural safeguards before the *Commissioner* may order a property owner to take action to correct a violation or may order that the property be razed. They are requirements of administrative due process in actions by the government against the property owner. They do not relate to the issue of what notice is required before liability may be imposed upon a landlord in a negligence action brought by a *tenant* for injuries resulting from exposure to lead-based paint in the premises. They are not directed at the landlord-tenant relationship.

Section 301 merely provides that, whenever the Commissioner of Housing and Community Development determines that a violation of the Housing Code has taken place, the Commissioner must give notice of the violation to the owner in a specified form and manner. Section 303 provides that, in non-emergency situations, the Commissioner "shall order the correction by notice and service as provided above [in § 301]." Section 303 also states that, if the order is not complied with in a timely manner, it may be executed by the Commissioner's staff, and the expenses incurred by the agency will result in a lien on the property. Nevertheless, "before proceeding to execute any such order under the terms of § 303 of this Code, the Commissioner . . . shall serve and post notices" as provided for in the Baltimore City Building Code.[6]

The Housing Code provisions relied on in the *Richwind* opinion do not alter the requirements set forth by this Court

---

6. The notice provisions of the Baltimore City Building Code are discussed in this Court's recent opinion in *Murrell v. Mayor & City Council of Balt.*, 376 Md. 170, 829 A.2d 548 (2003). These provisions generally require the Commissioner to mail notices by certified mail and also post notices conspicuously on the property that is in violation of the Code. *See* Baltimore City Code, Art. 32, (2000 Repl.Vol.), § 123.3.

for a plaintiff to make out a *prima facie* case based on negligence. The Housing Code does not make the landlord's notice of a defective condition a factor with regard to the landlord's duty to the tenant.

In sum, the presence of flaking, loose, or peeling paint is a violation of the Housing Code. *Brown v. Dermer, supra,* 357 Md. at 361, 744 A.2d at 56–57 ("To be a violation, all that must be shown is that there was flaking, loose or peeling paint"). As earlier pointed out, certain provisions of the Housing Code were clearly enacted to prevent lead poisoning in children. Therefore, the plaintiff Sean is in the class of people intended to be protected by the Housing Code, and his injury, lead poisoning, is the kind of injury intended to be prevented by the Code. This is all that the plaintiffs must show to establish a *prima facie* case sounding in negligence.[7] Therefore, the notices of violation issued to Lewin Realty by the Department of Housing for unrelated properties were irrelevant and there should be a new trial as directed by the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE EVENLY DIVIDED BETWEEN THE PLAINTIFFS AND THE DEFENDANT.*

RAKER AND WILNER, JJ., dissent.

---

**7.** We note that other jurisdictions have charged landlords with notice of the conditions which a reasonable inspection would have revealed. For example, the Court of Appeals of New York, in *Juarez by Juarez v. Wavecrest Management Team,* 88 N.Y.2d 628, 649 N.Y.S.2d 115, 672 N.E.2d 135 (1996), charged landlords with notice of any hazardous condition in the rental premises in question. The Administrative Code of the City of New York required owners of multiple dwellings to "remove or cover" paint containing specified levels of lead if the owner has been notified that a child six years of age or younger resides in the dwelling. The Court of Appeals of New York ruled that, if the plaintiff can establish that the owner had actual or constructive notice that a child six years or younger resided in the dwelling, "a landlord who has such notice is chargeable with notice of any hazardous lead condition in that unit." 88 N.Y.2d at 638, 649 N.Y.S.2d 115, 672 N.E.2d at 137.

RAKER, Judge, with whom WILNER, Judge, joins, dissenting:

I respectfully dissent. The majority explicitly overrules *Richwind v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994)—a case that, until today, had never had any doubt cast upon it by this Court or any other—and holds that by enacting the Baltimore · City Housing Code, the City Council intended to abolish the element of notice in a common law negligence action for injuries resulting from flaking, loose or peeling paint. In the process of overruling *Richwind*, the majority also reads into the Code an ongoing, affirmative duty by landlords to inspect periodically each of their housing units for loose or flaking paint for as long as they retain ownership of the premises. I disagree with the majority's conclusion that the ordinance does away with the traditional, common law notice requirement to the landlord as a precursor to liability for negligence. I would not overrule *Richwind* in this regard.[1]

## I.

It is helpful to understand first what the majority's holding actually means and its implications for landlords and tenants in Baltimore. A violation of Baltimore's Housing Code occurs when the landlord does not comply with § 703, which mandates, in relevant part, that "[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose or peeling paint. . . ." Housing Code, Baltimore City Code (2000 Supp.) Art. 13, § 703(b)(3). The majority asserts that "if the plaintiffs can establish a violation of the Housing Code which proximately caused [their] injuries, then the plaintiffs are entitled to have . . . their complaint submitted to the trier of facts." Maj. op. at 81. Read together, the result of the majority's holding is astounding: *Any* flaking, loose or peeling paint in a leased premises, combined with an injury from lead paint, automatically gives rise to a cognizable action,

---

1. In addition, under principles of *stare decisis,* the Court should not overrule *Richwind.*

worthy of a jury trial. The majority admits as much in summarizing its holding:

"In sum, the presence of flaking, loose, or peeling paint is a violation of the Housing Code. As earlier pointed out, certain provisions of the Housing Code were clearly enacted to prevent lead poisoning in children. Therefore, the plaintiff Sean is in the class of people intended to be protected by the Housing Code, and his injury, lead poisoning, is the kind of injury intended to be prevented by the Code. *This is all the plaintiffs must show to establish a* prima facie *case sounding in negligence.*"

*Id.* at 89. (emphasis added) (citations and footnote omitted). The majority's new rule means that the landlord will be forced to defend the case in court even if the plaintiff concedes that the landlord behaved reasonably in not knowing about a Code violation. Without any express instruction, the majority reads into the statute the dramatic institution of a wholly new regulatory scheme that essentially imposes strict liability upon landlords and makes landlords the insurers of litigants for injuries sustained by a minor plaintiff due to exposure to lead-based paint. *See Richwind,* 335 Md. at 674–75, 645 A.2d at 1153 (noting that lack of a notice requirement to the landlord could impose a standard amounting to strict liability for any defect arising on the premises during the term of the lease); *Benik v. Hatcher,* 358 Md. 507, 750 A.2d 10 (2000) (reaffirming the *Richwind* holding that there is no duty to inspect premises during the tenancy). Furthermore, the majority's new rule means that plaintiff tenants will no longer be required to notify landlords of hazards in their dwelling home, hazards that they, not the landlord, are in the best position to identify.

The common law used to deal with such unfairness by providing that a landlord who had a valid excuse, such as lack of notice, for not remedying the violation would not be held liable, *see* RESTATEMENT (SECOND) OF TORTS § 288A(2)(b) (1965) (excusing liability for violation of a legislative enactment or administrative regulation when defendant neither knows nor should know of the occasion for compliance). But under the majority's new rule, no such excuse is relevant.

## II.

It is axiomatic that statutes are presumed not to make any alterations or innovations in the common law further than is expressly declared, and that when a statute does expressly revise the common law, it should be strictly construed. *Zetty v. Piatt,* 365 Md. 141, 153, 776 A.2d 631, 638 (2001) (noting that absent a clear indication to the contrary, we assume that a statute or ordinance did not intend to amend, nullify, or supersede the common law); *see also Bruce v. Dyer,* 309 Md. 421, 431–32, 524 A.2d 777, 782 (1987); *MacBride v. Gulbro,* 247 Md. 727, 729, 234 A.2d 586, 588 (1967); 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 50.05 (4th ed.1984).

In this case, we have a well-settled principle in Maryland common law that an element of a *prima facie* case for negligence for injuries resulting from lead-based paint is that the landlord knew or had reason to know of flaking paint on the premises. Although we articulated this rule in *Richwind,* its principles and origins had been well-established and thoroughly developed in this State's common law. *See Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548, 554 (1976); *Ramsey v. D.P.A. Associates,* 265 Md. 319, 322, 289 A.2d 321, 323 (1972); *Katz v. Holsinger,* 264 Md. 307, 312, 286 A.2d 115, 118 (1972); *Pinehurst Co. v. Phelps,* 163 Md. 68, 73, 160 A. 736, 738 (1932). Moreover, it has been followed since *Richwind* by this Court without disapproval. *See, e.g., Jones v. Mid–Atlantic Funding,* 362 Md. 661, 766 A.2d 617 (2001); *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000). Thus, when we decided *Richwind,* we confirmed only what the common law clearly mandated, particularly in light of the City Council's lack of an express intent to abolish or modify this rule.

Furthermore, although the majority refers to § 17.6 of the Restatement (Second) of Property in support of its holding, in actuality, when one examines the official commentary to that section, it is obvious that the Restatement affirms the common law requirement of notice, even in view of a statute that

imposes a duty on the landlord to maintain safely the premises. The commentary reads as follows:

> "**a. Rationale.** Insofar as a *duty created by a statute or administrative regulation* is concerned, the rule of this section is based on the assumption that the statute or regulation represents a legislative determination of the standard of conduct required of the landlord, so that the violation constitutes negligence *per se.* . . .

* * * *

> "**c. Landlord's knowledge of the condition.** The landlord is subject to liability under the rules of this section only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care. . . . Where the condition arises after the tenant takes possession, the landlord may not be able, in the exercise of reasonable care, to discover the condition, in which case the landlord will not be liable under the rules of this section until he has had a reasonable opportunity to remedy the condition after the tenant notifies him of it. Where the landlord is able to discover the condition by the exercise of reasonable care, he is subject to liability after he has had a reasonable opportunity to discover the condition and to remedy it."

RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENANT § 17.6 cmt. a-c (1977) (emphasis added). The Restatement here assumes that if the landlord violates a standard which constitutes negligence *per se*,[2] no liability ordinarily attaches for injuries stemming from the violation *unless* the landlord had actual or constructive notice prior to the violation. Therefore, not only does § 17.6 not support the majority's view that notice is not required, but even in light of an applicable statutory provision that creates a duty upon the landlord, the

---

**2.** In Maryland, violation of a statute is not negligence *per se* but rather constitutes evidence of negligence. The rationale requiring notice where the statutory violation is negligence *per se* applies with equal force to Maryland where the violation may be evidence of negligence.

Restatement contemplates retention of the notice element in a *prima facie* case sounding in negligence.

There is a plethora of support in the common law of Maryland and other jurisdictions in this country for the proposition that a notice requirement is relevant to the plaintiffs' *prima facie* case for negligence, applicable to the Housing Code violation unless the City Council had expressly removed notice considerations from the action. *See, e.g., Juarez v. Wavecrest Management Team Ltd.,* 88 N.Y.2d 628, 649 N.Y.S.2d 115, 672 N.E.2d 135 (1996) (holding that to be liable for injuries sustained by lead paint, a landlord must have actual or constructive notice of both the hazardous condition and the residency of a child six years-old or younger); *Gore v. People's Sav. Bank,* 235 Conn. 360, 665 A.2d 1341 (1995) (violation of a state statute prohibiting flaking paint constitutes negligence *per se,* but defendant may avoid liability by showing that he neither knows nor should know of occasion for compliance); *Winston Properties v. Sanders,* 57 Ohio App.3d 28, 565 N.E.2d 1280 (1989) (assuming *arguendo* that the landlord was negligent *per se* under city regulations, tenant was still required to show that the landlord had notice of the defective condition).

But there is no support, much less express support, for an intent by the Baltimore City Council to remove entirely the notice element from these types of negligence actions. The City Council did not intend, by setting general standards for repairs and safety for all rental units, to nullify years of common law precedent. Quite to the contrary, the City Council *followed* the common law in passing the Housing Code. *See Richwind,* 335 Md. at 674–675, 645 A.2d at 1153–1154. As the majority notes, § 301 of the Code mandates that "whenever the Commissioner of Housing and Community Development determines that a violation of the Housing Code has taken place, the Commissioner must give notice of the violation [to the landlord]." Maj. op. at 87. Emphasizing that the *Richwind* Court's reliance on this provision was its key "flaw," the majority baldly asserts that somehow the requirements of notice for the Commissioner are different and shed

no light on notice considerations in private actions. *Id.* at 88. It seems to me that the same fundamental notions of fair play and substantial justice that underlie notice requirements for the Commissioner ought to weigh heavily against an interpretation of the statute that repudiates these wise and longstanding principles in our law.

This Court restated the standard for liability recently in *Brown v. Dermer*, 357 Md. 344, 744 A.2d 47. Chief Judge Bell, writing for the Court, stated as follows:

"[T]o survive summary judgment, a plaintiff alleging lead paint poisoning caused by a landlord's negligence in failing to correct a defective condition in a leased dwelling must first meet the 'reason to know' test. Under this test, a plaintiff must present evidence that establishes that the landlord knew or had reason to know of a condition on the premises posing an unreasonable risk of physical harm to persons in the premises. The fact that a defendant is a landlord or engages in a certain trade is not enough to meet the reason to know standard. Some evidence that, by virtue of those facts, the defendant has knowledge sufficient to support an inference of knowledge of the condition is required."

357 Md. at 361–362, 744 A.2d at 57 (citations omitted). We should not overrule this case or the other progeny of *Richwind*.

III.

Realizing that its ruling necessarily entails landlords periodically inspecting the homes of tenants, the majority is forced to read such a duty into the ordinance. The majority reasons that because § 909 of the Housing Code gives the landlord the *right* to intrude into the tenant's property to make repairs, it also imposes upon the landlord an affirmative *duty* to inspect the premises from time to time. (How often? Every day? Every week? Once a month? Every few months? The majority does not specify this crucial issue.) A duty and a right obviously are not equivalent, and § 909's grant of a right

to enter implies nothing about whether the landlord retains that right when the tenant has or has not given notice of a dangerous condition.

Even were I to accept the majority's imposition of a duty from a patch-work of various provisions pulled together to imply a duty where none exists, the logical implications of the majority's reading of the statute are untenable. For example, the majority finds that "[a]lthough [§ 909] may not explicitly require the landlord to perform periodic inspections, it grants such right to the landlord and shows that the City anticipated that periodic inspections might be necessary to comply with the Code." Maj. op. at 84. Here, when the majority says "the Code," it refers to §§ 702, 703, and 706 of the Code. But there is no reason why the majority's reasoning should be limited to those provisions. For example, under the majority's reasoning, periodic inspections by landlords would also be required for § 503 (requiring each unit to maintain a toilet in good working order); § 504 (requiring the same for bathtubs); and § 612 (requiring heating facilities be properly designed, installed and balanced or adjusted, and maintained in good and safe working condition).

Indeed, even if the majority could limit its holding to §§ 702, 703, and 706 of the Code (which the majority cannot), the implications of its holding remain illogical. Section 703, in addition to requiring the apartment be free of flaking paint, also mandates: every "facility, piece of equipment, or utility which is required under this Code shall be ... constructed or installed to function safely and effectively and shall be maintained in good working condition"; all ceilings, walls, and floors must be free from holes, large cracks, or loose and deteriorated materials; and all doors must fit into the openings for which they are hung. Must the landlord now do periodic inspections to check for each and every one of these violations as well? The majority provides no rational basis for distinguishing flaking paint from these other requirements of § 703.

IV.

The Connecticut Supreme Court, in considering the same issue, found that notice to the landlord was necessary before liability upon the landlord may be imposed. Relying heavily upon our reasoning in *Richwind,* that court concluded:

"We agree that the language and histories of these sections indicate the legislature's intent to prohibit the use of lead-based paints and to prevent the existence of chipped or otherwise dilapidated paint for the protection of children, but the plaintiffs have shown us nothing to indicate that the legislature intended the extraordinary result of holding a landlord liable for injuries sustained by a minor due to exposure to lead-based paint regardless of a valid excuse or justification, such as lack of notice, for the violation.

\* \* \* \*

"As in *Richwind,* the common law in Connecticut has always included a notice requirement as part of a tenant's cause of action. Furthermore, as in *Richwind,* the statutory scheme at issue in this case does not eliminate that requirement. Indeed, the statutory framework evinces a legislative intent to afford landlords the opportunity to remedy violations of housing standards after receipt of notice."

*Gore v. People's Sav. Bank,* 665 A.2d. at 1352–54.

In sum, I believe that absent notice, actual or constructive, the landlord has no duty, even under the Housing Code, to inspect the demised premises during the tenancy. The tenant is in a superior position to detect chipping or peeling paint and should therefore notify the landlord of the hazard. Nor does the landlord have a duty to continuously inspect premises under the tenant's control to see if there is chipping or peeling paint; that duty to inspect arises at the inception of the tenancy. This is so under the common law, and under the City Code. Accordingly, I dissent.

Judge WILNER has authorized me to state that he joins in this dissent.